NEW JERSEY GUILD OF HEARING AID DISPENSERS, A NON-PROFIT CORPORATION OF THE STATE OF NEW JERSEY; JOSEPH IACONO AND ROBERT P. AHRENS, APPELLANTS, v. VIRGINIA LONG, DIRECTOR OF THE DIVISION OF CONSUMER AFFAIRS; THE DIVISION OF CONSUMER AFFAIRS, AN AGENCY OF THE STATE OF NEW JERSEY; THE HEARING AID DISPENSERS EXAMINING COMMITTEE AND THE STATE BOARD OF MEDICAL EXAMINERS, AGENCIES OF THE STATE OF NEW JERSEY UNDER THE JURISDICTION OF THE DIVISION OF CONSUMER AFFAIRS, RESPONDENTS.

Argued December 13, 1977—Decided March 9, 1978.

546

548

Mr. *Jack B. Kirsten* and Mr. *Elmer J. Bennett* argued the cause for appellants (*Messrs. Freidin, Kirsten, Friedman & Cherin,* attorneys; *Messrs. Carpenter, Bennett and Morrissey,* of counsel; *Mr. Bennett, Mr. Kirsten* and Ms. *Deborah W. Babcox,* on the brief).

Mr. *Steven I. Kern,* Deputy Attorney General, argued the cause for respondents (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mrs. Erminie L. Conley,* Deputy Attorney General, of counsel).

· The opinion of the court was delivered by

PASHMAN, J. Concern over allegations of consumer abuses in the sale of hearing aids prompted the Legislature to pass the Hearing Aid Dispensers Act, *L.* 1973, *c.* 19, *N. J. S. A.* 45:9A–1 *et seq.* ("the Act"), which became law on January 31, 1973. This enactment created a Hearing Aid Dispensers Examining Committee ("the Committee") under the State Board of Medical Examiners in the Division of Consumer Affairs of the Department of Law and Public Safety. *N. J. S. A.* 45:9A–1, 3. The Committee's statutory mandate was to

\* \* \* ascertain the facts concerning the dispensing and sale of hearing aids, for the purpose of determining the need for, and desirability of, rules and regulations to promote the health, safety and welfare of the public and to effectuate the purposes of this act and to aid the committee in the performance of its powers and duties hereunder, and [to] make and promulgate, with the approval of the board [*i. e.,* the State Board of Medical Examiners] rules and regulations for said purposes \* \* \*.

[*N. J. S. A.* 45:9A–7]

On April 9, 1976, the Committee[1] filed its proposed rules

---

[1]The Committee's membership is comprised of three qualified hearing aid dispensers (who must be certified by the National Hearing

and regulations governing the practice of hearing aid dispensing in New Jersey, which were then unanimously approved by the State Board of Medical Examiners prior to their publication in the New Jersey Register.

The Committee conducted a public hearing on May 21, 1976 in Newark, at which time 19 witnesses, including the Director of the Division of Consumer Affairs ("the Director"), testified and numerous documentary exhibits were received. The Director testified that the "major problem areas perceived by the Committee" as requiring remedial regulatory action included

inappropriate fitting because of lack of proper supervision of the dispenser and the trainee; false advertising calculated to mislead the public into the belief that hearing aid dispensers have a medical degree or background; secrecy by the dispenser as to exactly what the consumer is paying for and exactly what he is getting, with the result that the consumer is unable to ascertain by independent means the viability of his aid; unscrupulous activity by the door-to-door salesman of hearing aids, especially with respect to the elderly; and unconscionable pricing of hearing aids. [Testimony of Virginia Long, Director, Division of Consumer Affairs, before the Hearing Aid Dispensers Examining Committee, May 21, 1976.]

The regulations as originally proposed were modified prior to their unanimous adoption by the Committee. The regulations as amended were unanimously approved by the State Board of Medical Examiners, as required by *N. J. S. A.* 45:9A–7, in July 1976 and thereafter filed with the Secretary of State. The final regulations appear in the New Jersey Administrative Code at *N. J. A. C.* 13:35–8.1 *et seq.*

In August 1976 enforcement of the Committee regulations was stayed by a single judge of the Appellate Division on the petition of the New Jersey Guild of Hearing Aid Dis-

Aid Society or its equivalent), one physician who is a diplomate of the American Board of Otolaryngology, one clinical audiologist who is certified by the American Speech and Hearing Association, one public member, and the Director of the Division of Consumer Affairs, *ex officio,* or his or her designee. *N. J. S. A.* 45:9A–3.

pensers ("the Guild"), and two of the Guild's officers in their individual capacities as hearing aid dispensers. The appeal sought review of the validity of the Committee regulations pursuant to *R.* 2:2–3. Consideration of the Guild's application for a stay pending appeal was consolidated with the appeal on the merits by the Appellate Division.

On December 15, 1976, Judge Botter, writing for the Appellate Division, upheld the validity of the Committee rules and regulations and denied the Guild's request that their enforcement be enjoined. 145 *N. J. Super.* 580 (App. Div. 1976). On December 22, 1976, the Guild filed a Petition for Rehearing and Stay of Judgment with the Appellate Division which was summarily denied on January 4, 1977. The basis for that petition was the imminent promulgation of regulations affecting the practice of hearing aid dispensing by the United States Food and Drug Administration ("FDA") and the consequent possibility of federal preemption of the Committee regulations.

On January 21, 1977 the Guild filed a petition for certification together with a notice of appeal alleging constitutional questions and a motion for a stay of the Appellate Division's judgment and enforcement of the Committee regulations pending disposition of the matter by this Court. On February 15, 1977, the Guild supplied us with advance copies of the proposed FDA regulations whose preemptive effect it had asserted below. Upon review of same, we granted the requested stay on February 15, 1977 and subsequently granted the Guild's petition for certification. 74 *N. J.* 247 (1977).

[

### The Regulatory Background

The Act defines the activity it seeks to regulate, the "practice of dispensing and fitting hearing aids," as "the evaluation or measurement * * * of human hearing * * * and the consequent selection of [sic] adaptation or sale of hearing aids intended to compensate for hearing loss * * *." *N. J.*

*S. A.* 45:9A–2(d). A hearing aid dispenser is defined as "a person engaged in the fitting and selling of hearing aids to a person with impaired hearing." *N. J. S. A.* 45:9A–2(e). The Committee created for this purpose is empowered to set educational and licensing requirements for practitioners, *N. J. S. A.* 45:9A–8 to 15, and to grant temporary licenses in certain circumstances. *N. J. S. A.* 45:9A–16. The Director of Consumer Affairs is authorized to discipline licensees for enumerated types of misconduct, the most expansive category of which is "unethical conduct," defined to include, *inter alia,* the "obtaining of any fee or the making of any sale by fraud or misrepresentation," *N. J. S. A.* 45:9A–17(c)(1), the use of misleading or false advertising or other representations, *N. J. S. A.* 45:9A–17(c)(3), the use of bait and switch sales tactics, *N. J. S. A.* 45:9A–17(c)(4), and the use of representations connoting medical expertise. *N. J. S. A.* 45:9A:17(c)(5), as well as for violations of the Act or the Committee rules and regulations. *N. J. S. A.* 45:9A–17(f). In addition, violations of the Act are subject to penalties and, where appropriate, restitution. *N. J. S. A.* 45:9A–19. They are also enjoinable at the suit of the Director of Consumer Affairs. *N. J. S. A.* 45:9A–20. Specifically exempted from the coverage of the Act are hearing aid dispensers whose practices are affiliated with academic institutions, public programs, or charitable organizations, unless such dispensers sell hearing aids; also exempted are licensed physicians. *N. J. S. A.* 45:9A–22.

Licensed dispensers are required to advise prospective purchasers at the outset of a hearing aid dispenser's lack of medical or audiological expertise and to provide all purchasers with a detailed written receipt which includes a statement that the purchaser has been so advised. *N. J. S. A.* 45:9A–23. Whenever a licensee learns that a prospective purchaser has certain ascertainable medical conditions, he must, prior to fitting and selling a hearing aid to that person, recommend in writing that the person consult a hearing specialist or other physician (providing the names and addresses of at least three such

physicians) and receive a receipt from the prospective purchaser acknowledging that the recommendation has been given. *N. J. S. A.* 45:9A–24.

The Guild's challenge to the Committee's regulatory action is directed at certain portions of the comprehensive substantive regulation, *N. J. A. C.* 13:35–8.24, entitled "General Rules and Regulations." It specifically objects to the provision of *N. J. A. C.* 13:25–8.24(c) which exempts from the coverage of the Act the activities of certified audiologists unless such persons engage in the dispensing of hearing aids. *N. J. A. C.* 13:35–8.24(c)(3). The Guild contends that this exemption for nondispensing audiologists is not authorized by the Act and in fact is internally inconsistent with another regulation in the same subsection, *N. J. A. C.* 13:35–8.24(c)(7), which includes certain activities preliminary to a sale within the definition of "fitting and selling hearing aids," activities in which the Guild claims certified audiologists engage.

Also contested by the Guild is the Committee's prohibition of the use of the term "certified hearing aid audiologists" by hearing aid dispensers in any advertising because of its potention misleading effect on prospective purchasers. *N. J. A. C.* 13:35–8.24(f)(3). The Guild disputes the legitimacy of that conclusion and contends that such a prohibition was not contemplated by the Act. As its source of authority for the promulgation of this rule, the Committee cites *N. J. S. A.* 45:9A–17(c)(3) and (5) and 23(b)(7).

The subjects of the Guild's most vehement protest are the regulatory provisions mandating advance disclosure and itemization in pricing, requiring the posting of a retail price list of all hearing aids offered for sale, and setting a price guideline for charges made for dispensing services and equipment. *N. J. A. C.* 13:35–8.24(g)(1) (prescribing a receipt form); (k)(1) and (2); (h)(4); and (k)(4), respectively. The Guild contends that these rules regulate the business and profits of hearing aid dispensers in a manner contrary to the legislative intent of the Act and not authorized thereunder.

Viewing the price guideline as setting a price ceiling, the Guild argues that any such regulatory restrictions would constitute an unauthorized exemption from the proscriptions of the New Jersey Antitrust Act. *N. J. S. A.* 56:9–1 *et seq.*, for the practice of hearing aid dispensing. The Guild argues further that the price and price disclosure regulations are unconstitutional because they unreasonably restrict property rights, arbitrarily discriminate against the dispensing profession and unduly burden the practice of that profession without any justifying public need. Cited as statutory authority for these rules by the Committee are *N. J. S. A.* 45:9A–7, 17(c), 23(b) and 26.

Finally, the Guild challenges the ban on unsolicited sales visits to the homes or places of business of prospective purchasers without prior consent and the prohibition of the sale of a hearing aid to a person who has not been given a hearing test examination complying with certain specified technical standards. *N. J. A. C.* 13:35–8.24(j) and (e). The Guild contends that no legislative intent to regulate dispensing practices by proscribing home visits exists and, alternatively, that this rule is unnecessary because consumers are adequately protected by the Act's ban of unnecessary fittings and the obtaining of fees for services by fraud or misrepresentation. *See N. J. S. A.* 45:9A–17(c). The Guild argues that the testing standards imposed have an unduly burdensome effect on dispensers who cannot afford sophisticated testing equipment and that in the absence of any showing that such exacting standards are required to fit a hearing aid properly, the regulatory standards are unreasonable and constitute a denial of substantive due process.

Further complicating this picture of pervasive regulation of the hearing aid industry is the entry of the federal government into this field. Congress has enacted the "Medical Device Amendments of 1976," *Pub. L.* 94–295, 90 *Stat.* 539–583, effective May 28, 1976, to the Federal Food, Drug, and Cosmetic Act ("the FDCA"), 21 *U. S. C.* § 301 *et seq.*, which provides the FDA with specific statutory au-

thorization to regulate "medical devices" so as to ensure their safety and effectiveness prior to their marketing to consumers. *See generally* 1976 *U. S. Code Cong. and Admin. News* 1070 *et seq.* The FDA is given this premarket clearance authority with respect to, *inter alia,* devices which are intended for human use and which do not operate chemically or require metabolization in order. to achieve their intended effect. *See* 21 *U. S. C.* § 321(h). Pursuant to the grant of authority contained in the amended FDCA, the Commissioner of Food and Drugs, on behalf of the Secretary of Health, Education and Welfare (HEW), proposed regulations covering the labeling and conditions of sale of hearing aids on February 15, 1977. *See* 21 *U. S. C.* 360j (e)(1)(B); proposed 21 *C.F.R.* §§ 801.420, 421 (42 *Fed. Reg.* 9294–6 (February 15, 1977)). These regulations as originally promulgated became effective on August 25, 1977.[2]

The FDA hearing aid regulations are divided into two sections, one concerned with labeling requirements for hearing aids (21 *C.F.R.* § 801.420) and the other (21 *C.F.R.* § 801.421) imposing certain conditions on and preconditions to their sale. The FDA distinguishes between three categories of professionals involved with hearing disabled persons: the "ear specialist," a licensed physician specializing in the diagnosis and treatment of ear diseases and hearing loss problems (21 *C.F.R.* § 801.420(a)(2)); the "audiologist," a trained specialist in the evaluation and rehabilitation of persons with hearing disorders (21 *C.F.R.* § 801. 420(a)(4)); and the "dispenser," engaged in the "sale,

---

2The effective date of the hearing aid regulations was originally scheduled to be August 15, 1977; their effective date was stayed by the FDA until August 25, 1977 as a result of litigation challenging the validity of the regulations, *American Speech & Hearing Association v. Califano,* Civil No. 77–1327, United States District Court for the District of Columbia. *See* 42 *Fed. Reg.* 40215 (August 9, 1977). The regulations were ultimately upheld by Judge Gerhard Gesell on December 19, 1977.

lease or rental of hearing aids" to the consuming public (21 *C.F.R.* § 801.420(a)(3)).

The FDA has established the medical evaluation of the prospective user as a mandatory precondition to the sale of a hearing aid to that person; said evaluation must have been made within the preceding six months. 21 *C.F.R.* § 801.421(a)(1). However, the medical evaluation may be waived by a prospective adult user under certain specified conditions. 21 *C.F.R.* § 801.421(a)(2).

The amended FDCA contains an explicit statutory provision concerning the preemptive effect of the FDCA and regulations promulgated pursuant thereto on any state or local requirements. A procedure is established whereby otherwise preempted state and local requirements may receive an exemption from preemption by the FDCA upon meeting certain enumerated criteria. *FDCA* § 521, 21 *U. S. C.* § 360k.[3]

---

[3]*FDCA* § 521, 21 *U. S. C.* § 360k, provides:

State and local requirements respecting devices — General rule

(a) Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

 (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

 (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

*Exempt requirements*

(b) Upon application of a State or a political subdivision thereof, the Secretary may, by regulation promulgated after notice and opportunity for an oral hearing, exempt from subsection (a) of this section, under such conditions as may be prescribed in such regulation, a requirement of such State or political subdivision applicable to a device intended for human use if —

 (1) the requirement is more stringent that a requirement under this chapter which would be applicable to the device if an exemption were not in effect under this subsection; or

 (2) the requirement —

 (A) is required by compelling local conditions and

 (B) compliance with the requirement would not cause the device to be in violation of any applicable requirement under this chapter.

The FDA has promulgated proposed regulations detailing the administrative procedures to be followed in determining whether a particular state or local requirement is preempted by the FDCA and in applying, if necessary, for an exemption from federal preemption. Proposed 21 *C.F.R.* § 808.1 *et seq.* (42 Fed. Reg. 30383–9 (June 14, 1977)).[4]

As a result of the timing of the promulgation of the FDA hearing aid and "preemption-exemption" regulations, the Appellate Division did not have the opportunity to review those regulations in considering the Guild's argument that the Committee's regulations were federally preempted under the FDCA. Another significant development in the case also came too late for consideration by the Appellate Division. In responding to the federal preemption claim advanced by the Guild, the Director of Consumer Affairs offers a letter dated June 2, 1977 from the Chief Counsel of the FDA to the Deputy Attorney General who is the Committee's counsel, which states that in the opinion of the FDA the only provision of the Committee regulations which would be preempted by the FDA hearing aid regulations was the presale hearing test requirement of *N. J. A. C.* 13:35–8.24(e). The stated basis for this conclusion is that the Committee regulation "establishes conditions of sale that are different from those provided in the FDA regulations." The FDA consequently concluded that the "provisions of [§ 8.24(e)] relating to conditions of sale are preempted" under *FDCA* § 521(a), 21 *U. S. C.* § 360k(a).

Pursuant to this administrative opinion letter, the Director concedes that *N. J. A. C.* 13:35–8.24(e) is federally preempted. Nevertheless the Director relies on this expres-

---

[4]Public comments on these proposed regulations were to be submitted by August 15, 1977, with the final regulations to become effective 60 days after publication in the Federal Register; as of this date, they have not yet been published in final form. On October 18, 1977, the FDA said that applications for preemption exemptions would be processed in accordance with the proposed regulations. *See* 42 *Fed. Reg.* 55648–49 (October 18, 1977).

sion of FDA opinion as dispositive authority on the issue of the Guild's contention that the remainder of the Committee regulations are similarly preempted by the FDA hearing aid regulations.[5] The Director advises that the State has applied to the FDA for an exemption from preemption for *N. J. A. C.* 13:35–8.24(e),[6] which will remain preempted until such time as an exemption is granted, and contends that it is unnecessary for the Court to decide the preemption issue with respect to that regulation.

In upholding the validity of the Committee's regulations, the Appellate Division rejected the Guild's arguments that the challenged regulations contravene the legislative intent underlying the Act by regulating the business aspects of hearing aid dispensing and thus exceed the scope of the authority delegated to the Committee by the Act. *See* 145 *N. J. Super.* at 584. The court found no federal preemption resulting from *FDCA* § 521 standing alone and felt that consideration of the preemptive effect of any FDA hearing aid regulations was premature prior to their becoming effective in final form. *Id.* at 588. We shall address these arguments and the Guild's other bases of attack on the Committee regulations *seriatim.*

## II.

### A. *The Scope of the Regulatory Power Delegated By the Act*

The Director concurs in the Guild's observation that the Committee regulations go substantially beyond mere regula-

---

[5] Although the opinion letter of the FDA Chief Counsel is not a formal FDA advisory opinion as to the preemption *vel non* of state or local device requirements as contemplated by proposed 21 *C. F. R.* § 808.5, to our knowledge that opinion letter has not been challenged nor repudiated. We therefore assume for purposes of this opinion that this constitutes the current position of the FDA.

[6] As of this date, the FDA has not granted the State's request for an exemption from preemption with respect to *N. J. A. C.* 13:35–8.24(e).

tion of the competency of the dispensers and the safety and effectiveness of the hearing aids they sell. The abuses which some of the challenged regulations were intended to correct were described by the Director at the public hearing:

They prohibit the use of terms calculated to connote non-existent medical competency. [*N. J. A. C.* 13:35-8.24(f)(3)] They require an itemized receipt, in conformity with the trend in consumerism, to provide an individual with full knowledge of the product he is buying in advance of sale, which receipt will assist the Division in the enforcement of the Act by requiring full disclosure of the charges assessed for various phases of the dispensing procedure and the actual cost of the hearing aid. [*N. J. A. C.* 13:35-8.24(g), (h)(4), and (k)(1) and (2)]

Further, the rules prohibit unsolicited home visits as a means of avoiding the fast talking, high pressure of the unethical practitioner. [*N. J. A. C.* 13:35-8.24(j)]

And, in addition, they take a giant step forward by reallocating the burden in price gouging cases so that the onus is not on the consumer to show unfairness but on the dispenser to show that no over-reaching occurred and that the price charged was not unconscionable. [*N. J. A. C.* 13:35-8.24(k)(4)]

In response to the Guild's assertions that these regulations are *ultra vires,* the Director urges that the challenged regulations are "well within the statutory authority of the Committee, and in many cases are pursuant to specific statutory mandates."

The seminal case concerning the standards applicable to judicial review of the validity of regulations promulgated by an administrative agency is *Consolidation Coal Co. v. Kandle,* 105 *N. J. Super.* 104 (App. Div. 1969), aff'd o. b. 54 *N. J.* 11 (1969). Judge Goldmann, writing for the court, there held that quasi-legislative administrative rulemaking does not require specific findings of fact based on evidence adduced at the public hearing in support of each regulatory provision subsequently adopted and further that the existence of such supporting factual bases would be presumed until rebutted by the party attacking the administrative action. 105 *N. J. Super.* at 113-120; *see also In re*

*Promulgation of Rules of Practice,* 132 *N. J. Super.* 45, 49 (App. Div. 1974) certif. den. 67 *N. J.* 95 (1975).

█ *Kandle* also established that administrative regulations "must: be accorded a presumption of reasonableness" and placed the burden on the attacking party to demonstrate that they are arbitrary, capricious, unduly onerous or otherwise unreasonable. 105 *N. J. Super.* at 118; *see also In re Matter of Public Hearings,* 142 *N. J. Super.* 136, 156 (App. Div. 1976); *City Consumer Services v. Dept. of Banking,* 134 *N. J. Super.* 588, 594 (App. Div.) certif. den. 69 *N. J.* 73 (1975). Earlier decisions of this Court had established that "[a]dministrative rules and regulations have in their support the rebuttable presumption of validity if they come within the ambit of delegated authority," and that unless such regulations are "clearly *ultra vires* on their face," the party contesting them has the burden of proving their invalidity. *In re Regulation F–22, Office of Milk Industry,* 32 *N. J.* 258, 261–262 (1960); *In re Weston,* 36 *N. J.* 258, 263 (1961); *see also Cole Nat. Corp. v. State Bd. of Examiners,* 57 *N. J.* 227, 231 (1970). The *Weston* court also held that the reviewing court is not confined to consideration of the statutory authority for a particular regulation cited by the administrative agency but may consider the entire enabling legislation in order to ascertain "if there is in fact sufficient underlying authority." 36 *N. J.* at 263. As a result of this "customary rebuttable presumption of validity and regularity afforded to administrative regulations generally," *Motyka v. McCorkle,* 58 *N. J.* 165, 181 (1971), an *ultra vires* finding is disfavored:

An administrative regulation, purporting to effectuate a statute, will not be set aside on the ground that it transgresses the statute unless the transgression is plain; the presumption is in favor of validity.
[*Lane v. Holderman* 40 *N. J. Super.* 329, 335 (App. Div. 1956) aff'd 23 *N. J.* 304 (1956)]

██ An administrative regulation "must be within the fair contemplation of the delegation of the enabling stat-

ute." *So. Jersey Airways v. Nat. Bk. of Secaucus,* 108 *N. J. Super.* 369, 383 (App. Div. 1970). The authority possessed by an administrative agency "* * * consists of the powers expressly granted which in turn are attended by those incidental powers which are reasonably necessary or appropriate to effectuate the specific delegation." *In re Regulation F-22, Office of Milk Industry, supra,* 32 *N. J.* at 261 (citation omitted) ; *Cammarata v. Essex County Park Comm'n,* 26 *N. J.* 404, 411 (1958). This Court has held that the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and that the courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent. *See In re Suspension of Heller,* 73 *N. J.* 292, 303 (1977) ; *Cammarata v. Essex County Park Comm'n, supra,* 26 *N. J.* at 411; *Lane v. Holderman, supra,* 23 *N. J.* at 315. *In Heller,* Chief Justice Hughes stated :

Where, as here, the task of the regulatory agency is "to protect the health and welfare of members of the public" by assuring that all licensed practitioners are qualified, competent and honest, the grant of implied powers is particularly important.

[73 *N. J.* at 303–304 (citation omitted)]

In determining whether a particular administrative act enjoys statutory authorization, the reviewing court may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives. *Id.* at 303 and cases there cited. The purpose of this inquiry is to ascertain whether the requisite authority may be said to be implicitly supplied, as "[t]hat which is implied is as much a part of the law as that which is expressed." *Id.; In re Gastman,* 147 *N. J. Super.* 101, 109 (App. Div. 1977).

 Another basic tenet of judicial review is that the courts are not free to substitute their judgment as to the wisdom of a particular administrative action for that of the

agency so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable:

* * * If there is any fair argument in support of the course taken [by the agency] or any reasonable ground for difference of opinion among intelligent and conscientious officials, the decision is conclusively legislative, and will not be disturbed unless patently corrupt, arbitrary or illegal. Doubts held by the court as to the wisdom of the administrator's decision do not alter the case * * *.

> [*Flanagan v. Civil Service Dept.*, 29 *N. J.* 1, 12 (1959) (citations omitted); *see also City of Elizabeth v. Sullivan*, 125 *N. J. Super.* 569, 574 (App. Div. 1973)]

■ Application of the foregoing principles to the Guild's challenge to the Committee regulations on *ultra vires* grounds confirms the correctness of the Appellate Division's conclusion that the regulations do not exceed the authority delegated to the Committee by the Act. The Guild's contention that the Act did not contemplate regulation of the business aspects of hearing aid dispensing is without foundation and indeed would amount to an interpretation of the Act in a manner contrary to its manifest purpose. The extremely circumscribed interpretation of the Act's purposes proffered by the Guild hardly comports with the liberal construction mandated for regulatory enactments in the field of public welfare. Furthermore, the Guild can point to nothing on the face of any of the regulations warranting a conclusion of *ultra vires* so as to deprive them of the presumption of validity ordinarily accorded administrative regulations.

Our evaluation of the Act and its legislative history convinces us that the Committee has been delegated substantially plenary authority over the entire field of hearing aid dispensing, including the business practices of dispensers. Its regulations do not exceed the scope of that broad delegation and are fully consistent with the underlying legislative goals of correcting abuses and promoting professionalism in the sale of hearing aids. The challenged regulations constitute

permissible administrative selections of the appropriate means of accomplishing the salutary objectives of the Act; as such, further judicial inquiry into their wisdom and the possible existence of more desirable regulatory alternatives is foreclosed.

## B. *Alleged Antitrust Problems*

■ ■ Nor do we find merit in the Guild's assertion that validation of the regulatory price guideline in *N. J. A. C.* 13:35-8.24(k)(4) would create an unwarranted exception to the New Jersey Antitrust Act, *L.* 1970, *c.* 73, *N. J. S. A.* 56:9-1, *et seq.*, and would result in a conflict with the federal antitrust laws.[7] The Guild argues that the price guideline will effectively operate as a price ceiling (notwithstanding the specific disclaimer of such a purpose in the regulation itself) and thus constitutes an impermissible exception to the state antitrust law unintended by the Legislature in view of the Act's lack of authorization therefor. We agree with the Appellate Division's conclusion that the regulation means what it says and merely establishes a price guideline which forewarns dispensers that they must be able to justify a retail charge for services and equipment in excess thereof. Our Antitrust Act specifically exempts such fee guidelines from its proscriptions. *N. J. S. A.* 56:9-5(b)(9). However, even if the guideline constituted a price restriction in restraint of trade, the Guild's argument must fail, as the express terms of the Antitrust Act itself indicate its inapplicability to any anticompetitive action authorized by state law. *N. J. S. A.* 56:9-5(c).

---

[7]*N. J. A. C.* 13:35-8.24(k)(4) provides:

A retail charge for services and equipment referred to in paragraph 2 of this subsection of greater than three times the price initially charged to the dispenser for the hearing aid itself by a hearing aid manufacturer may be deemed evidence of overreaching and fraud in the sale of a hearing aid. This section shall not, however, be construed to set a maximum or minimum allowable fee.

█ The claimed conflict of the price guideline with the federal antitrust laws is similarly spurious. Again, even if the regulation did set an anticompetitive price ceiling, it would nevertheless qualify for the so-called "state-action exemption" to the federal antitrust laws. That doctrine was first announced in *Parker v. Brown*, 317 *U. S.* 341, 63 *S. Ct.* 307, 87 *L. Ed.* 315 (1943), where the Supreme Court held that the Sherman Act, 15 *U. S. C.* § 1 *et seq.*, was not intended to apply to certain types of governmental action by the states even though a restraint of trade resulted.

The threshold inquiry in determining if an anticompetitive activity is State action of the type the Sherman Act was not meant to proscribe is whether the activity is required by the State acting as sovereign * * * [the] anticompetitive activities must be compelled by direction of the State acting as a sovereign.

> [*Goldfarb v. Virginia State Bar*, 421 *U. S.* 773, 790–91, 95 *S. Ct.* 2004, 2015, 44 *L. Ed.* 2d 572, 587 (1975) ; *see also Cantor v. Detroit Edison Co.*, 428 *U. S.* 579, 590–91, 96 *S. Ct.* 3110, 3117, 49 *L. Ed.* 2d 1141, 1149–50 (1976)]

The most recent consideration of the appropriate circumstances for application of this exemption was in *Bates v. Arizona State Bar*, 433 *U. S.* 350, 97 *S. Ct.* 2691, 53 *L. Ed.* 2d 810 (1977). There the Supreme Court held that the disciplinary rules of the Arizona Supreme Court regulating the practice of law were entitled to the state-action exemption because those rules "reflect[ed] a clear articulation of the State's policy with regard to professional behavior" in an area "at the core of the State's power to protect the public" and emanated from "the ultimate body wielding the State's power over the practice of law." 433 *U. S.* at 360–362, 97 *S. Ct.* at 2698, 53 *L. Ed.* 2d at 821–22. The Court took pains to distinguish *Cantor, supra,* and *Goldfarb, supra,* both of which had held certain state regulatory action not protected by the antitrust exemption, as cases where that conclusion did not have the "undesired effect" of diminishing the authority of the states to regulate their professions. *See*

*Bates,* 433 *U. S.* at 359–363 and 360 n. 11, 97 *S. Ct.* at 2696–2698 and 2697 n. 11, 53 *L. Ed.* 2d at 820–822 and 821 n. 11.

It is manifest that the Committee's regulatory price guideline is entitled to the antitrust exemption under the *Bates* rationale. The regulation is a formal expression of this State's policy concerning ethical behavior of members of the dispensing profession regulated by the Act for the purpose of protecting the public. The price guideline is a key element of the Act's comprehensive scheme to eliminate fraudulent and unconscionable practices in the dispensing of hearing aids to the public and thus is essential to the accomplishment of the Legislature's purpose in enacting the Act and creating the Committee. Accordingly, we are satisfied the regulatory price guideline of *N. J. A. C.* 13:35–8.24(k) (4) would qualify for the state-action exemption from the federal antitrust laws.

## C. *The Constitutionality of the Act*

The Guild further argues that if the challenged regulations are found not to exceed the powers delegated to the Committee, the provisions of the Act authorizing those regulations are unconstitutional. The Guild's claim that the Act unfairly and arbitrarily burdens dispensers with detailed regulation imposed on no other similar profession need not long detain us. In rejecting an identical argument, this Court has previously observed that "there is no need to regulate all professions alike." *In re Weston,* 36 *N. J.* 258, 265 (1961), citing *Williamson v. Lee Optical Co.,* 348 *U. S.* 483, 489, 75 *S. Ct.* 461, 99 *L. Ed.* 563 (1955) and *Semler v. Oregon State Bd. of Dental Examiners,* 294 *U. S.* 608, 610, 55 *S. Ct.* 570, 79 *L. Ed.* 1086 (1935). *Williamson, supra,* the landmark case on the constitutional requirements in this area, held that remedial legislative action "may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."

348 *U. S.* at 489, 75 *S. Ct.* at 465. We have only recently reaffirmed the vitality of this principle:

> \* \* \* [T]he Legislature may attempt to regulate a given area without having to undertake a complete reform of all potential abuses.
>
> [*Common Cause v. N. J. Elec. Law Enforcement Comm'n,* 74 *N. J.* 231, 245 n. 4 (1977) (citations omitted)]

Thus, the fact that the Legislature might have selected hearing aid dispensing to be the first profession of its type subjected to pervasive state regulation in the public interest does not render that choice any less a permissible exercise of the police power or constitute a denial of equal protection. *N. J. Chapter, Amer. I.P. v. N. J. State Bd. of Prof. Planners,* 48 *N. J.* 581, 601–03, 609–09 (1967), app. dism'd and *cert.* dcn. 389 *U. S.* 8, 88 *S. Ct.* 70, 19 *L. Ed.* 2d 8 (1967).

Nor need we dwell too long on the Guild's substantive due process attack on the Act if it is construed to authorize the regulatory price guideline and the pre-sale testing requirement. This Court has recently engaged in a comprehensive review of the "\* \* \* limited role of the judiciary in applying the principles of substantive due process to economic and social legislation" in the context of municipal rent control ordinances in *Hutton Park Gardens v. West Orange Town Council,* 68 *N. J.* 543, 562 (1975). A brief recapitulation of the salient points of that decision enables us to dispense with a detailed discussion of most of the Guild's arguments. The portion of its holding relevant for present purposes was that

> legislative enactments regulating prices, including municipal rent control ordinances, are subject to the same narrow scope of review under principles of substantive due process as are other enactments under the police power: could the legislative body rationally have concluded that the enactment would serve the public interest without arbitrariness or discrimination?
>
> [68 *N. J.* at 563–64 (citations omitted)]

We emphasized the limited function of reviewing courts in this area:

"So far as the requirement of due process is concerned, * * * a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adopted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the Legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders the court *functus officio*."

> [*Hutton Park, supra* at 563, quoting *Nebbia v. New York*, 291 U. S. 502, 537, 54 S. Ct. 505, 78 L. Ed. 940 (1934)]

*Hutton Park* also addressed the burden of proof which must be met by a substantive due process challenger:

Legislative bodies are presumed to act on the basis of adequate factual support and, absent a sufficient showing to the contrary, it will be assumed that their enactments rest upon some rational basis within their knowledge and experience. * * * This presumption can be overcome only by proofs that preclude the possibility that there could have been any set of facts known to the legislative body or which could reasonably be assumed to have been known which would rationally support a conclusion that the enactment is in the public interest. * * * The judiciary will not evaluate the weight of the evidence for and against the enactment nor review the wisdom of any determination of policy which the legislative body might have made.

> [68 N. J. at 564–65 (citations omitted)]

*See also Brunetti v. Borough of New Milford*, 68 N. J. 576, 594 (1975).

In *N. J. Chapt., Amer. I.P. v. N. J. State Bd. of Prof. Planners, supra,* we recognized the appropriate extent of judicial deference to a legislative exercise of the police power:

If pursuit of a particular occupation or the practice of any of the learned or statutory professions can be said to have a connection with or an impact upon the public weal, and there is any reasonable

basis for regulation or control thereof to protect or preserve the particular public interest affected, the legislature may do so constitutionally, so long as the means adopted are not arbitrary and are reasonably related to the felt public need. If the need is not wholly illusory and the regulation imposed is reasonably calculated to satisfy the need, the wisdom or unwisdom of the particular form of regulation cannot be a matter of judicial concern. If the subject is within the police power of the State, even debatable questions as to reasonableness of the means employed are not for the courts but for the Legislature.

[48 *N. J.* at 599-600 (citations omitted)]

*See also Abelson's, Inc. v. N. J. State Bd. of Optometrists,* 5 *N. J.* 412, 419-421 (1950).

 Notwithstanding the foregoing admonitions, the Guild persists in urging this Court to question the legislative judgment as to the public need for the Committee regulations promulgated pursuant to the Act's directive. However, the Guild has utterly failed to negative the existence of any conceivable state of facts which would establish a public need for the Act and its implementing regulations. Nor has the Guild demonstrated any irrationality in the relationship between the means adopted for the accomplishment of the undeniably proper legislative purpose of eliminating abuses in a health-related profession and that salutary goal. Similarly absent is any cogent showing that compliance with the regulations is impossible — at best, the Guild's complaints indicate that compliance with the pre-sale testing requirement of *N. J. A. C.* 13:35-8.24(e) would be inconvenient and expensive for some dispensers. In view of the Guild's failure to carry the burden of proof demanded in such constitutional attacks, we perceive no basis for invalidation of the Act on due process grounds.

## III

### Federal Preemption

 The Guild asserts that the Committee regulations are preempted pursuant to the command of *FDCA* § 521(a)

as a result of the promulgation of the FDA's hearing aid regulations. Resolution of this issue entails consideration of Congress' command as to the preemptive effect of its regulatory scheme in this field; that command may be "explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.*, 430 *U. S.* 519, 525, 97 *S. Ct.* 1305, 1309, 51 *L. Ed.* 2d 604, 613–14 (1977) (citations omitted). In *Jones, supra*, the most recent authoritative explication of the principles governing a claim that federal regulation of a particular subject matter precludes concurrent state regulation thereof, the Court noted that only where Congress' preemptive intent is " 'clear and manifest' " will an exercise of the police power in a field traditionally subject to state regulation be superseded by federal law. *Id.* at 525, 97 *S. Ct.* at 1309, 51 *L. Ed.* 2d at 614, quoting *Rice v. Santa Fe Elevator Corp.*, 331 *U. S.* 218, 230, 67 *S. Ct.* 1146, 91 *L. Ed.* 1447 (1947).

We have noted the Supreme Court's reluctance "to find an intent to preempt where state legislation has been enacted to * * * protect public health." *City of Philadelphia v. State of New Jersey*, 73 *N. J.* 562, 570 (1977) *prob. juris. noted* —— *U. S.* ——, 98 *S. Ct.* 501, 54 *L. Ed.* 2d 448 (1977). Our initial task then is to determine whether New Jersey's regulation of hearing aid dispensing practices constitutes an exercise of the police power in an area of regulation traditionally within the exclusive domain of state power and thus is entitled to the benefit of this presumption against preemption.

For purposes of ascertaining whether a tradition of plenary state regulatory power in a particular field exists, it is appropriate to utilize an expansive approach wherein consideration is given to state regulation of activities with attributes similar to hearing aid dispensing. Regulation of dispensing practices is equatable with regulation of other activities affecting public welfare for those purposes. Professional licensing and regulation of professional misconduct are activities which have long been committed to the

states, whose regulatory power over such matters is substantially plenary. *See Barsky v. Bd. of Regents,* 347 *U. S.* 442, 451, 74 *S. Ct.* 650, 98 *L. Ed.* 829 (1954) ; *Semler v. Oregon Bd. of Dental Examiners,* 294 *U. S.* 608, 612, 55 *S. Ct.* 570, 79 *L. Ed.* 1086 (1935) ; *Linder v. United States,* 268 *U. S.* 5, 18 (1925) ; *S.P.S. Consultants v. Lefkowitz,* 333 *F. Supp.* 1373, 1376–77 (S.D. N. Y. 1971) (three-judge court) ; *F.T.C. v. Simeon Mgmt. Corp.,* 391 *F. Supp.* 697, 705 (N.D. Cal. 1975). This Court has recognized the broad scope of the State's regulatory power over professional pursuits. *N. J. Chapter, Amer. I.P. v. N. J. State Bd. of Prof. Planners, supra,* 48 *N. J.* at 599–600 ; *see In re Suspension of Heller, supra,* 73 *N. J.* at 306 (pharmacy) ; *Abelson's, Inc. v. N. J. State Bd. of Optometrists, supra,* 5 *N. J.* at 418–421. We perceive no distinction between the professions involved in those cases and hearing aid dispensing sufficient to warrant a conclusion that the extent of the regulatory power is diminished with respect to the latter. In view of the historical recognition of and deference to the substantially plenary power of the states to regulate professions affecting the public welfare, we are satisfied that the policy disfavoring a finding of preemption, which is based on considerations of federalism, *see Jones,* 430 *U. S.* at 525, 97 *S. Ct.* at 1309, 51 *L. Ed.* 2d at 614 is applicable.

Under *Jones, supra,* the inquiry into a claim of federal preemption of state law must normally take into account both the "explicit" and "implicit" branches of that doctrine, even where Congress has expressly stated its wishes as to the preemptive reach of a particular enactment. One of the issues in *Jones* was the preemptive effect to be accorded a provision of the Fair Packaging and Labeling Act, 15 *U. S. C.* § 1451 *et seq.,* which stated a Congressional intent to supersede state laws which were "less stringent" or required labeling information "different from" that mandated by the federal law. 15 *U. S. C.* § 1461. In construing this express preemption provision, the Court interpreted the term "different from" to evince a Congressional intent to

preempt only state laws "which impose requirements inconsistent with those imposed by federal law." 430 *U. S.* at 540, 97 *S. Ct.* at 1316, 51 *L. Ed.* 2d at 623. Applying that interpretation to the state law before it, the Court stated:

Since it would be possible to comply with the state law without triggering federal enforcement action we conclude that the state requirement is not inconsistent with federal law.

[*Id.*]

The Court accordingly held that the particular state law was not preempted by the "explicit" preemption provision of the federal statute. *Jones* has authoritatively established that a state law is not inconsistent with, and thus not "different from," federal law for preemption purposes where it is possible to comply with the state requirement without violating any federal requirements. The dissenting justices agreed that noninconsistency was the proper test for determining the explicit preemption issue and that a conclusion to that effect "dictates" a holding that "* * * Congress has not expressly prohibited state regulation in this field." 430 *U. S.* at 544, 97 *S. Ct.* at 1318, 51 *L. Ed.* 2d at 625.

 *FDCA* § 521(a) expressly preempts non-federal regulation of any device intended for human use where such regulation seeks to impose requirements which are "different from, or in addition to" whatever federal requirements are applicable to the device *and* which purport to "relate[s] to the safety or effectiveness of the device or to any other matter included in a [FDCA] requirement applicable to the device." 21 *U. S. C.* § 360k(a). Thus, for a state [*i. e.,* non-federal] regulation to be preempted it must (1) be a "requirement applicable to the device" within the meaning of the FDCA (2) which relates to a matter included in a federal requirement applicable to the device and (3) which is "different from, or in addition to," any such federal requirements so applicable under the FDCA and any FDA regulations thereunder. State regulations applicable to a device which are "different from, or in addition to" the federal re-

quirements but which do not "relate" to any matter included in any federal requirements for that device would not appear to be preempted by § 521(a). Nor would state regulations which do so "relate" but are not "different from, or in addition to" the applicable federal requirements appear to be preempted.

State regulations applicable to devices which are preempted under § 521(a) may be saved from invalidity pursuant to the procedure established in § 521.(b). The Secretary of HEW (who has delegated his authority to the FDA Commissioner) is there empowered to exempt state regulations otherwise preempted by § 521(a) by granting an "exemption from federal preemption" which authorizes the continued imposition of the state regulation. 21 *U. S. C.* § 360k(b). In order to qualify for such an exemption, the state regulation must be either more stringent than the corresponding federal requirement which would otherwise preempt it *or* be required by "compelling local conditions" and not cause a violation of any applicable federal requirements. *Id.* It is important to note that for preemption to occur, the state regulation must meet both of the criteria set forth in § 521(a), as the phrasing there is in the conjunctive. On the other hand, for the state regulation to be eligible for a preemption exemption, it need only qualify under one of the § 521(b) tests, as they are phrased in the disjunctive. The criteria for an exemption from preemption are not to be confused with the criteria for preemption itself; § 521.(b) comes into play only after it has been determined that the particular state law has been preempted under § 521(a).

In one of its proposed preemption-exemption regulations, the FDA has stated its interpretation of the scope of § 521 (a)'s preemption and enumerates certain types of state regulations which may "affect devices" but are nevertheless not regarded as preempted by § 521(a):

State or local requirements are preempted only when the Food and Drug Administration has established *specific counterpart regula-*

*tions* or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific Food and Drug Administration requirements. There are other State or local requirements that affect devices which are not preempted by section 521(a) of the act because they are not "requirements applicable to a device" within the meaning of section 521(a). The following are examples of State or local requirements that are not regarded as preempted by section 521 of the act:

(1) Section 521(a) does not preempt State or local requirements of general applicability where the purpose of the requirement relates either to other products in addition to devices e.g., requirements such as general electrical codes, and the Uniform Commercial Code (warranty of fitness), or to unfair trade practices in which requirements are not limited to devices.

(2) Section 521(a) does not preempt State or local requirements that are *equal to, or substantially identical to,* requirements imposed by or under the act.

(3) Section 521(a) does not preempt State or local permits, licenses, registrations, certifications, or other requirements relating to the approval or sanction of the practice of medicine, dentistry, optometry, pharmacy, nursing, podiatry, or any other of the healing arts or allied medical sciences or related professions or occupations that administer, dispense, or * * * sell devices.

> [Proposed 21 C. F. R. § 808.1(d)
> 42 Fed. Reg. 30387 (June 14, 1977)
> (emphasis added)]

With respect to subsection (3) of proposed 21 *C. F. R.* § 808.1(d) above, the FDA has amplified on the reasoning behind its conclusion of non-preemption of such professional licensing regulations:

> Such regulations are not *directly* applicable to devices within the meaning of the Act and, therefore, are not preempted.
> [42 Fed. Reg. 30384 (June 14, 1977)
> (comment to proposed 21 C. F. R. §§
> 808.1 *et seq.*) (emphasis added)]

The two alternative bases for an FDA determination of non-preemption by § 521(a) are whether the particular state regulation

\* \* \* is (i) equal to or substantially identical to a requirement under the act applicable to the device, or (ii) is not a requirement within the meaning of section 521 of the act and therefore is not preempted;

> [Proposed 21 *C. F. R.* § 808.5(b)
> (1) 42 Fed. Reg. 30388 (June
> 14, 1977)]

 It is a fundamental maxim that the opinion as to the construction of a regulatory statute of the expert administrative agency charged with the enforcement of that statute is entitled to great weight and is a "substantial factor to be considered in construing the statute." *Youakim v. Miller,* 425 *U. S.* 231, 235, 96 *S. Ct.* 1399, 1402, 47 *L. Ed.* 2d 701 (1976); *N. Y. Dept. of Social Services v. Dublino,* 413 *U. S.* 405, 421, 93 *S. Ct.* 2507, 37 *L. Ed.* 2d 688 (1973); *Red Lion Broadcasting v. F. C. C.,* 395 *U. S.* 367, 381, 89 *S. Ct.* 1794, 23 *L. Ed.* 2d 371 (1969); *Matawan Borough v. Monmouth Cty. Tax Bd.,* 51 *N. J.* 291, 300 (1968); *State v. LeVien,* 44 *N. J.* 323, 330 n. 5 (1965). Such judicial deference to the administrative interpretation of a statute is even more appropriate "when the case involves the construction of a new statute by its implementing agency." *Natural Resources Defense Council, Inc. v. Train,* 166 *U. S. App. D. C.* 312, 326, 510 *F.* 2d 692, 706 (D. C. Cir. 1975); *Udall v. Tallman,* 380 *U. S.* 1, 16, 85 *S. Ct.* 792, 13 *L. Ed.* 2d 616 (1965). This deference is, of course, not total, as the courts remain the "final authorities" on issues of statutory construction and are not obliged to "rubber stamp" their approval of the administrative interpretation. *Federal Maritime Commission v. Seatrain Lines, Inc.,* 411 *U. S.* 726, 745–46, 93 *S. Ct.* 1773, 36 *L. Ed.* 2d 620, quoting *Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission,* 390 *U. S.* 261, 272, 88 *S. Ct.* 929, 19 *L. Ed.* 2d 1090 (1968). This Court may appropriately follow the FDA's reasonable interpretation of the meaning of *FDCA* § 521(a) in considering the explicit preemption issue, since there are no "com-

pelling indications that it is wrong." *Red Lion Broadcasting Co. v. F. C. C., supra,* 395 *U. S.* at 381, 89 *S. Ct.* at 1802.

There is no question that Congress may authorize federal administrative agencies to preempt state laws by the promulgation of administrative regulations. *See, e. g., Burbank v. Lockheed Air Terminal, Inc.,* 411 *U. S.* 624, 93 *S. Ct.* 1854, 36 *L. Ed.* 2d 547 (1973) (FAA regulations). Thus the promulgation of the FDA hearing aid regulations has preempted state device regulations in accordance with *FDCA* § 521(a) as of their effective date. However, in an official advisory opinion, the FDA's Chief Counsel has expressed the view that only one section of the Committee regulations (*N. J. A. C.* 13:35–8.24(e)) would be subject to preemption by the FDA hearing aid regulations. An opinion letter from any agency counsel has been accorded the status of an official administrative interpretation for purposes of judicial deference thereto. *See Thorpe v. Housing Authority of Durham,* 393 *U. S.* 268, 276, 89 *S. Ct.* 518, 21 *L. Ed.* 2d 474 (1969). *Udall v. Tallman,* 380 *U. S.* 1, 16, 85 *S. Ct.* 792, 13 *L. Ed.* 2d 616 (1965); *Brubaker v. Morton,* 500 *F.* 2d 200, 202 (9 Cir. 1974). Accordingly, the opinion of the FDA Chief Counsel as to the preemptive reach of the FDA hearing aid regulations with respect to the Committee regulations governing the practice of hearing aid dispensing in New Jersey must be considered as a very "substantial factor" weighing against an interpretation of the federal regulatory scheme that will result in a preemption finding.

However, wholly apart from any deference to the FDA's opinion that none of the Committee regulations other than *N. J. A. C.* 13:35–8.24(3) is federally preempted, we are satisfied from our own investigation that the narrow scope of the explicit preemption mandated by FDCA § 521(a) as interpreted by the FDA dictates an identical conclusion. Key aspects of dispensing sales practices covered by the Committee regulations are left largely unregulated by the FDA hearing aid regulations, which relate predominantly to requirements

of labeling and conditions of sale.[8] As stated in a venerable preemption case:

\* \* \* There is no constitutional rule which compels Congress to occupy the whole field. Congress may circumscribe its regulation and occupy only a limited field. When it does so, state regulation outside that limited field \* \* \* is not forbidden or displaced.

> [*Kelly v. Washington*, 302 *U. S.* 1, 10, 58 *S. Ct.* 87,
> 92, 82 *L. Ed.* 3 (1937)]

More recently, the Fifth Circuit has observed:

\* \* \* Where Congress has chosen to "occupy" a field, but has not undertaken to regulate every aspect of that area, the states have the implied reservation of power to fill out the scheme.

> [*Chemical Specialties Mfrs. Ass'n, Inc. v. Clark*,
> 482 *F.* 2d 325, 327 (5 Cir. 1973); citing *Florida
> Lime and Avocado Growers, Inc. v. Paul*, 373 *U. S.*
> 132, 142, 83 *S. Ct.* 1210, 10 *L. Ed.* 2d 248 (1963)]

We interpret *FDCA* § 521(a) as expressly envisioning such supplemental state regulation insofar as it limits the definition of the state regulations it supersedes to state requirements "applicable to" devices, thus permitting a wide variety of conceivable state regulations to remain unaffected.

Most of the Committee regulations would not seem to qualify as requirements directly "applicable to" a device within the meaning of § 521(a) and would therefore fall within the area unregulated by the federal scheme. The Committee regulations exempting certified audiologists from the

---

[8]We note that the FDA has formally stated its view that trade regulations proposed by the Federal Trade Commission governing hearing aid industry sales practices, *see* 40 *Fed. Reg.* 26646–51 (June 24, 1975), portions of which are substantially identical to several provisions of the Committee regulations, "\* \* \* complement, rather than conflict with [the] FDA regulations relating to labeling and conditions of sale of hearing aids." *See* 42 Fed. Reg. 9286 (February 15, 1977) (comment to proposed 21 *C. F. R.* § 801.420, 421). As of this date, the FTC rules have not been finally promulgated and their effect, if any, on the Committee regulations is not an issue in this case.

coverage of the Act, proscribing the use of the term "certified hearing aid audiologist" and requiring dispensers to post retail price lists plainly implicate no matter of federal concern and could not seriously be regarded as subject to federal preemption. The exemption for certified audiologists relates only to the administration of the Act in New Jersey and cannot even remotely be characterized as a requirement applicable to a device. The Committee's ban of the use of a misleading professional title similarly is not a requirement directly applicable to a device and in any event would certainly fall within the category of state licensing requirements for device dispensers which the FDA views as not preempted by § 521(a). See proposed 21 C. F. R. § 808.1(d)(3), 42 Fed. Reg. 30387 (June 14, 1977), ante at 574. The mandatory posting of retail price lists similarly does not constitute a requirement applicable to a device.

The Committee regulations banning non-consensual home visits by dispensers and setting price guidelines, would also appear to qualify as non-preempted state professional licensing rules for dispensers, as by their express terms they are concerned with ethical practices. Further reasons for our conclusion that these Committee regulations are not preempted are their manifest inapplicability to a device for § 521(a) purposes and their total unrelatedness to any federal requirements imposed by or under the Act.

However, preemption of N. J. A. C. 13:35–8.24(e), the Committee's pre-sale testing requirement, would appear to be dictated because that regulation makes a hearing test in conformity with the standards therein set forth a condition precedent to the sale of a hearing aid. As noted by the FDA Chief Counsel, this condition is at variance with the conditions of sale imposed by the FDA's "specific counterpart" regulation in 21 C. F. R. § 801.421(a). However, unlike the FDA Chief Counsel, we believe that the reason the Committee regulation is preempted under § 521(a) is that it would operate to create a prerequisite to the sale of a hearing aid that is "in addition to" that specified in the federal regula-

tion, since a dispenser would be forced to comply with two variant rules prior to dispensing a hearing aid. His opinion that the basis of premption is the fact that the Committee regulation is "different from" the FDA regulation, *see ante* at 558 would appear untenable in light of the interpretation given to the identical statutory language in *Jones, supra,* by the Supreme Court. *See ante* at 571. Because it would be possible for a dispenser to comply with both the Committee's pre-sale testing requirement and the FDA's pre-sale medical evaluation requirements, the state regulation is not "inconsistent with," and thus not "different from," the applicable federal regulation. However, our quarrel with the Chief Counsel's interpretation of the effect of *FDCA* § 521 (a) in this regard is inconsequential, since this Committee regulation is preempted on the alternative theory in any event. Nevertheless, the state will in all likelihood be granted the exemption from preemption already applied for with respect to *N. J. A. C.* 13:35–8.24(e), as it is "more stringent" than the corresponding FDA regulation and its implementation would afford a "higher degree of protection" to prospective users than the corresponding federal requirement. *See* proposed 21 *C. F. R.* § 808.3(c), 42 Fed. Reg. 30388 (June 14, 1977). Upon the grant of the exemption from preemption, both the federal medical evaluation requirement and the New Jersey pre-sale hearing test requirement will be in force and must be complied with by dispensers.

At first blush the Committee regulations requiring dispensers to provide consumers, in advance of any sale, with itemized receipts and specifying the contents thereof also seem to impose conditions of sale "in addition to" those included in the FDA regulations. However, certain significant differences exist between these regulations and the pre-sale testing requirement which would justify a contrary conclusion. The pre-sale testing requirement had a "specific counterpart" in the FDA regulation which requires (absent a waiver) a medical evaluation prior to the dispensing of any hearing aide. 21 *C.F.R.* § 801.421(a). The pre-sale

testing requirement was thus a requirement applicable to a device which related to a matter included in a federal requirement and was "in addition to" that federal requirement, consequently falling within the express terms of § 521(a). It and its "specific counterpart" regulation both established required procedures in advance of the actual dispensing of a hearing aid which were designed to ensure that the use of an aid by the prospective purchaser was appropriate and necessary. Since the Committee regulation sought to accomplish that purpose in a manner to some extent duplicative of that called for by the directly applicable federal requirement, its invalidation necessarily followed.

Unlike the situation with respect to the pre-sale testing requirement, the Committee receipt regulations do not have any "specific counterpart" FDA regulation nor are they seeking to accomplish the same purpose as, and thus arguably duplicative of, the FDA's medical evaluation requirement. The Committee receipt rules specify only the "business procedures" which must accompany any sale of an aid and do not purport to deal with the issue of the prospective user's need for and potential benefit from a hearing aid. They are thus less directly applicable to the device than the pre-sale testing requirement, as well as being "unrelated" to any matter included in a federal requirement, since the FDA regulations are silent as to any "business procedures" attendant upon the dispensing of an aid and the receipt requirements do not seek to achieve the same end as the FDA medical evaluation rule.

We discern no potential areas of even slight conflict between the state requirements applicable to the practice of dispensing and the FDA hearing aid regulations. None of the Committee regulations is "inconsistent with" the federal regulations within the meaning of that term for purposes of the test for explicit preemption under *Jones, supra.* Accordingly, we hold that with the exception of the pre-sale testing requirement of *N. J. A. C.* 13:35–8.24(e), the Committee regulations challenged by the Guild are not pre-

empted under *FDCA* § 521(a) by the FDCA or the FDA hearing aid regulations promulgated thereunder.

██ Ordinarily, the next step in our preemption analysis would be consideration of the "implicit" branch of that doctrine, which necessitates an inquiry into "whether both [federal and state] regulations can be enforced without impairing the Federal superintendence of the field * * *." *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 *U. S.* 132, 142, 83 *S. Ct.* 1210, 1217, 10 *L. Ed.* 2d 248 (1963), quoted in *City of Philadelphia v. State of New Jersey, supra,* 73 *N. J.* at 569. However, notwithstanding the Supreme Court's admonition in *Jones, supra,* that a holding of no explicit preemption does not resolve the preemption issue, 430 *U. S.* at 540, 97 *S. Ct.* at 1316, 51 *L. Ed.* 2d at 623, we feel that consideration of the implicit preemption issue is inappropriate in the context of the unique preemption exemption mechanism established by Congress in *FDCA* § 521(b). We reach this conclusion for two reasons. In specifying a detailed formula for use in determining exactly which state laws are preempted by § 521(a), Congress has deliberately circumscribed the extent to which its enactment has occupied the field of device regulation. Congress' purpose thus appears to have been to control that field in a less than comprehensive manner, as it undeniably could have done had it been so inclined.

Moreover, any state laws which are supplanted pursuant to the explicit preemption provision of § 521(a) have not been condemned to abject invalidity — the usual fate of state laws struck down under the Supremacy Clause, *U. S. Const.* Art. VI. State laws so preempted may, upon application to the FDA and qualification under § 521(b), nevertheless gain renewed vitality by receiving an exemption from preemption. The creation of this novel exemption procedure is persuasive evidence of a Congressional intent to permit supplementary state regulation in the same field. In *Jones, supra,* where the Court felt compelled to consider the implicit preemption issue after determining that no explicit

preemption resulted from the statutory language, no similar preemption exemption provision existed. Our research has revealed no other federal statutes containing any authorization for the grant of an exemption from preemption by the administrative agency charged with enforcement of the federal regulatory scheme. However, in view of the establishment of this innovative exemption mechanism, it seems accurate to say that there is nothing "implicitly contained in the [FDCA's] structure and purpose," *Jones, supra,* 430 *U. S.* at 525, 97 *S. Ct.* at 1309, 51 *L. Ed.* 2d at 614, from which an unambiguous Congressional intent to preempt concurrent state regulation is reasonably inferable.

In fact, the structure and purpose of *FDCA* § 521 seem to point affirmatively to a contrary conclusion, as the goal of Congress seems to have been to preclude only those state laws regulating devices encompassed by § 521(a). By expressly permitting certain state laws which are explicitly preempted under § 521(a) to remain in effect pursuant to § 521(b), Congress has manifested its disinclination to have those state laws *not* reached by § 521(a) stricken down on implicit preemption grounds. Indeed, any such finding of implicit preemption would be corrosive of the Congressional purpose of having the preemptive reach of the *FDCA* and the validity of state device regulations measured according to its carefully constructed test in § 521(a). Judicial expansion of the narrow preemption flowing from § 521(a) would be discordant with that legislative objective. Such a precise Congressional delimitation of the extent to which federal law shall supersede and, in certain instances, tolerate concurrent state regulation, suggests that Congress is satisfied that effectuation of its goals in enacting the federal regulatory scheme is possible without a total exclusion of state law. In such circumstances, ascribing to Congress an implicit intent to have supplemental state regulations, not explicitly preempted, nevertheless invalidated as alleged "obstacles" to the accomplishment of those goals, *see Hines v. Davidowitz,* 312 *U. S.* 52, 67, 61 *S. Ct.* 399, 85 *L. Ed.* 581

(1941), quoted in *Jones, supra,* 430 *U. S.* at 526, 540, 97 *S. Ct.* at 1309, 1316, 51 *L. Ed.* 2d at 614, 623, seems quite anomalous.

For the foregoing reasons, the judgment of the Appellate Division, as modified by our finding of preemption as to the pre-sale test requirement of *N. J. A. C.* 13:35–8.24(e), is affirmed. Our stay of the enforcement of the Committee regulations is hereby dissolved.

The Director may move for modification of our judgment with respect to that regulation upon receipt of the appropriate exemption from preemption in regard thereto from the FDA. We retain jurisdiction for this limited purpose.

*For affirmance as modified* — Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*For reversal*—None.