A. A. MASTRANGELO, INC., AVON LANDFILL CORP., IMPAC, INC., INDUSTRIAL HAULAGE CORP., INTERCITY SERVICE, INC., UNITED CARTING COMPANY, INC., AND WASTE DISPOSAL, INC., APPELLANTS, v. COMMISSIONER OF THE DEPARTMENT OF ENVIRONMENTAL PROTECTION AND DEPARTMENT OF ENVIRONMENTAL PROTECTION, RESPONDENTS.

THE COUNTY OF UNION, THE CITY OF ELIZABETH AND THE BOROUGH OF KENILWORTH, APPELLANTS, v. COMMISSIONER OF THE DEPARTMENT OF ENVIRONMENTAL PROTECTION OF THE STATE OF NEW JERSEY, RESPONDENT.

THE BOROUGH OF KENILWORTH, APPELLANT, v. COMMISSIONER OF THE DEPARTMENT OF ENVIRONMENTAL PROTECTION OF THE STATE OF NEW JERSEY AND THE DEPARTMENT OF ENVIRONMENTAL PROTECTION OF THE STATE OF NEW JERSEY, RESPONDENTS.

CITY OF ELIZABETH, APPELLANT, v. COMMISSIONER OF THE DEPARTMENT OF ENVIRONMENTAL PROTECTION OF THE STATE OF NEW JERSEY AND THE DEPARTMENT OF ENVIRONMENTAL PROTECTION OF THE STATE OF NEW JERSEY, RESPONDENTS.

Argued December 14, 1981—Decided August 11, 1982.

*Theodore A. Schwartz* and *Alfred V. Gellene* argued the cause for appellants A. A. Mastrangelo, Inc., Avon Landfill Corp., Impac, Inc., Industrial Haulage Corp., Intercity Service, Inc., United Carting Company, Inc., and Waste Disposal, Inc. (*Schwartz, Steinberg, Tobia, Stanziale & Gordon* and *Budd, Larner, Kent, Gross & Picillo*, attorneys; *Alfred V. Gellene*, on the briefs).

*Marvin Lehman,* Special Counsel, argued the cause for appellant City of Elizabeth (*Frank P. Trocino,* City Attorney, attorney).

*George Perselay,* Assistant County Counsel, on behalf of appellant County of Union, relied upon the briefs submitted on behalf of appellants A. A. Mastrangelo, Inc., Avon Landfill Corp., Impac, Inc., Industrial Haulage Corp., Intercity Service, Inc., United Carting Company, Inc., and Waste Disposal, Inc. (*Robert C. Doherty,* County Counsel, attorney).

*Aldan O. Markson,* on behalf of appellant, Borough of Kenilworth, relied upon the briefs submitted on behalf of appellants A. A. Mastrangelo, Inc., Avon Landfill Corp., Impac, Inc., Industrial Haulage Corp., Intercity Service, Inc., United Carting Company, Inc., and Waste Disposal, Inc.

*Deborah T. Poritz,* Deputy Attorney General, argued the cause for respondents (*James R. Zazzali,* Attorney General of New Jersey, attorney; *Stephen Skillman,* former Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

CLIFFORD, J.

More than eight years ago this Court declared that "[t]he disposition of solid waste in this State [had] reached crisis proportions", *Southern Ocean Landfill v. Mayor of Ocean Township,* 64 *N.J.* 190, 193 (1974); that "serious problems of public health, welfare and environmental control existed", *ibid.;* and that the legislature had "assumed the responsibility for regulating solid waste management on a statewide basis through regional, county and intercounty plans" under the Solid Waste Management Act (1970) and the Solid Waste Utility Control Act of 1970. *Id.* at 194. In 1975 the increasing scarcity of sites for dumping and landfill "reinforce[d] very strongly our consciousness of this extremely serious situation." *Hackensack Meadowlands v. Municipal Landfill Auth.,* 68 *N.J.* 451, 460 (1975), rev'd

on other grounds, 437 *U.S.* 617, 98 *S.Ct.* 2531, 57 *L.Ed.*2d 475 (1978); and see *id.* at 460–65.[1]

The Solid Waste Management Act, *N.J.S.A.* 13:1E–1 to –37 (Act), is the manifestation of the legislature's continuing concern with one of this state's most severe problems: the rapid disappearance of available solid waste disposal facilities. To implement the provisions of the Act, the Department of Environmental Protection (DEP or Department) promulgated certain rules and regulations, *N.J.A.C.* 7:26–1.11 to –1.15[2]. These appeals challenge the validity of those regulations.

The subject of the regulations under attack is the interdistrict flow of solid waste between solid waste planning districts in northeastern New Jersey. Appellants are various companies engaged in solid waste collection and disposal, the County of Union, the City of Elizabeth, and the Borough of Kenilworth. Appellants claim that the regulations exceed the scope of DEP's authority under the Act, that the regulations were promulgated in violation of the Act's procedural requirements, and that the regulations are arbitrary and capricious. More specifically, the arguments are that DEP has imposed a state response to solid waste management and disposal problems that has short-circuited the process of county decision-making and interest group

---

[1]So too has the federal government been conscious of the need for the development of a systematic and integrated approach to the disposition of solid waste. In 1965 Congress enacted the Solid Waste Disposal Act, 42 *U.S.C.* §§ 3251 to 3259, which was designed essentially to encourage and guide state governments in their approach to statewide, local and interstate solid waste management planning. In 1976 the Disposal Act was substantially amended through the enactment of Pub.L. 94–580 (1976), the Resource Conservation and Recovery Act of 1976. 42 *U.S.C.* §§ 6901 to 6987. The Recovery Act has served as a means for the federal government to provide technical and financial assistance for the formulation of solid waste management plans at the state and local levels. It also establishes as one of its prime objectives the development of resource recovery facilities. See *N.J.S.A.* 13:1E 2(b)(7). See also *infra* at 684 n.12.

[2]Although the parties cite to the regulations as they are set forth in the text of this opinion, the regulations in fact appear at *N.J.A.C.* 7:26–6.1 to –6.9.

participation envisioned by the Act; that DEP has improperly assumed the power to create waste collection and disposal franchises; and that the solution imposed by DEP is unfairly and irrationally burdensome on private solid waste haulers and landfill owners and on Union County municipalities.

We uphold the regulations in part, strike them in part, and remand for further proceedings.

I

The Solid Waste Management Act, with substantial amendments, *L.* 1975, *c.* 326, became effective on July 19, 1977. The Act represents a comprehensive statement by the legislature that provides a framework for the coordination of solid waste collection, disposal, and utilization activity in New Jersey. It sets forth a structured scheme for the integration of solid waste management planning at local, regional, and state levels. Central to the Act is the planning role of the DEP, which is directed to formulate, promulgate, and review biennially a statewide solid waste management plan. *N.J.S.A.* 13:1E–6(a)(3). That plan, which is to be promulgated within 180 days of the effective date of the Act, is to "provide the objectives, criteria and standards" for the Department's review of local plans submitted by each of the twenty-two Solid Waste Management Districts (districts) created by the Act.[3] It is also designed in part to assist the districts as they embark upon the development of county-wide solid waste management plans pursuant to the procedures and requirements set forth in *N.J.S.A.* 13:1E–20 and *N.J.S.A.* 13:1E–21.

Upon formulating a county-wide plan, each district is required to "cause a hearing to be held * * * for the purpose of hearing persons interested in, or who would be affected by, the adoption

---

[3]The Districts are comprised of the twenty-one counties of New Jersey and the Hackensack Meadowlands Developmental Commission, which was created by *N.J.S.A.* 13:17–1 to –86, the Hackensack Meadowlands Reclamation and Development Act. See *N.J.S.A.* 13:1E–2(b)(2) and *N.J.S.A.* 13:1E–19.

of the solid waste management plan" for that district. *N.J.S.A.* 13:1E–23(c). After the hearing, the district is to "adopt or reject, in whole or in part," its solid waste management plan. *N.J.S.A.* 13:1E–23(e).

The entire process culminates in the submission by the district of its plan to the Commissioner of DEP (Commissioner). See generally *N.J.S.A.* 13:1E–24. After receiving a district plan, the Commissioner is to (1) study and review the plan against the backdrop afforded by the statewide plan adopted pursuant to *N.J.S.A.* 13:1E–6(a)(3); (2) submit a copy of the plan for review and recommendations to a number of agencies, bureaus and divisions within the Department; and (3) submit a copy of the plan to the Board of Public Utility Commissioners (BPU) for its review and recommendations on the economic aspects of the plan. See *N.J.S.A.* 13:1E–24(a)(1), (2) and (3). Upon completing its study of the plan, and after receiving the recommendations from the services alluded to above, the Commissioner is to "approve, modify or reject" the district plan and certify his decision in that regard to the district in question. *N.J.S.A.* 13:1E–24(b).

In August of 1977, pursuant to statutory directive, the Department adopted a set of guidelines for use by the districts in the formulation of their individual solid waste management plans.[4] Thereafter, the Department distributed to the districts a series of management manuals that purported to be guides setting forth planning methodologies and implementation strategies designed to aid the districts in their local planning. The guidelines, in conjunction with the management manuals, were intended by DEP to satisfy in part its responsibility to provide

---

[4]*N.J.S.A.* 13:1E–6(a)(3) provides that "general guidelines sufficient to initiate the solid waste management planning process by solid waste management districts in this State shall be promulgated within 30 days of the effective date of this act." The guidelines adopted by the department entitled "Guidelines for Development and Formulation of District Solid Waste Management Plans" were primarily intended by the Department to satisfy this statutory responsibility.

the districts with a statewide solid waste management plan within 180 days of the effective date of the Act. *N.J.S.A.* 13:1E–6(a)(3). The interdistrict waste flow regulations addressed herein and a Department memorandum entitled "Policy and Procedures for Review of District Solid Waste Management Plans" are identified by DEP as the final segments of that Plan.

Upon receipt of the DEP guidelines and management manuals, the Solid Waste Management Districts began developing local solid waste plans. Throughout the district planning period DEP personnel met with district officials to discuss planning strategies and other problems.

On April 19, 1979, in accordance with the procedures outlined in the Act, Middlesex County adopted the first of the district solid waste management plans. Thereafter, the Hackensack Meadowlands Development Commission (HMDC) and the counties of Mercer, Union, Burlington and Somerset adopted their plans on May 2, 1979, June 6, 1979, June 7, 1979, June 10, 1979 and July 11, 1979, respectively, and each plan was submitted to the Commissioner of DEP for review.[5] See generally *N.J.S.A.* 13:1E–24.

The Commissioner found the plans to be unacceptable, in that they amounted to little more than a reflection of each district's parochial needs and were detrimental to the integrated statewide approach to solid waste management that was envisioned by the Act. In this connection the Commissioner noted the conspicuous absence of any agreement providing for interdistrict

---

[5]Upon its receipt of the plans, the Department distributed them to the various state agencies listed in *N.J.S.A.* 13:1E–24(a). The Board of Public Utilities (BPU), in accordance with *N.J.S.A.* 13:1E–24(a)(3), reviewed and commented upon the economic aspects of the proposed plan submitted by Union County. The other proposed plans submitted to the Department by the districts likewise were submitted to BPU for comment; however, BPU's comments on the economic aspects of only the Union County plan appear in the record.

waste flow and disposal,[6] which DEP believed was required by the Act and which was emphasized in the material distributed to the districts pursuant to *N.J.S.A.* 13:1E–6(a)(3).[7]

■ In response to what it viewed as the impending failure in regional solid waste planning, the Department undertook a study in the spring and summer of 1979 to develop an appropriate strategy with which to approach the pronounced need for interdistrict waste flow.[8] DEP concluded from that study that there existed a pressing need for an interdistrict solution to solid waste disposal. It indicated, for instance, that without interdistrict waste flow, the counties of Bergen, Essex, Hudson and Union had projected the useable lives of their solid waste facilities to be about two years.

---

[6]Interdistrict waste flow agreements are simply agreements whereby one district will allow a second district to dispose of some of its waste in facilities in the first district.

[7]The solid waste disposal capacities of the individual districts obviously are constrained by the unique characteristics that prevail in the various topographical regions of this State. Consequently, the capacity of each district to allow for intradistrict waste disposal often will vary to a considerable degree. In response to the problems engendered by this disparity, the legislature created in the Solid Waste Management Act a statutory scheme designed to encourage and in certain instances mandate interdistrict waste flow agreements. *N.J.S.A.* 13:1E–21(b)(3) is illustrative. That provision allows for a district with inadequate disposal facilities to negotiate with any other district for the use of the latter's disposal facilities or to certify a failure of the negotiations to DEP, in which case the Department is required to conduct a study bearing upon the problem while specifically considering a number of factors set forth in the statute. *Id.*

[8]DEP contends that the study was mandated by *N.J.S.A.* 13:1E–21(b)(3). In the instant case, the study does not appear to have been required by the express terms of the Act, inasmuch as DEP had not received any certification of failure at the time the study was commenced. Nevertheless, the study was a sensible search for the facts and as such satisfied the general requirement that administrative action be premised on reasonable grounds. See *Newark v. Natural Resource Council*, 82 *N.J.* 530, 541–42, *cert. denied*, 449 *U.S.* 983, 101 *S.Ct.* 400, 66 *L.Ed.*2d 245 (1980).

Thereafter, the DEP Solid Waste Administration conducted a series of meetings with officials from various Solid Waste Management Districts. At a meeting held in June 1979, the Commissioner told district officials that unless a workable approach to the interdistrict solid waste problem was developed within 90 days, DEP would impose its own solution.

At the final meeting between district officials and DEP on September 18, 1979, the Commissioner outlined the DEP interdistrict solid waste disposal strategy. Many of those in attendance were quick to articulate their concern about the inflated transportation and disposal costs that they expected would result from the redirection of established waste flow patterns, whereupon the Commissioner assured them that every effort would be made to provide state aid to cover additional costs.

In the fall of 1979, after it had reviewed the proposed solid waste management plans submitted by the districts, DEP issued its modifications of the HMDC, Middlesex, and Union plans pursuant to *N.J.S.A.* 13:1E–24. In each case, the modification mandated compliance with the proposed interdistrict waste flow regulations.

The Department's position regarding the interdistrict flow of solid waste was ultimately codified on November 5, 1979, with the Commissioner's promulgation of "Rules Concerning Inter-District Flow of Solid Waste Between and Among Solid Waste Management Planning Districts in Northeastern New Jersey." *N.J.A.C.* 7:26–1.11 to –1.15 (but see *supra* at 671 n.1). The regulations appeared in the New Jersey Register on December 6, 1979, 11 *N.J.R.* 616(b), and they were held open for comment until December 26, 1979. The regulations were adopted by the Department on December 31, 1979. 12 *N.J.R.* 71(b).

The principal thrust of the regulations is the redirection of solid waste flows away from the Hackensack Meadowlands

District (HMD), an approach that appellants view as untenable.[9] The Department cites several factors in support of its position. Initially, DEP notes that the Hackensack Meadowlands Reclamation and Development Act, *N.J.S.A.* 13:17–1 to –86, requires that HMD develop waste disposal facilities sufficient to enable it to continue to receive waste being deposited in the HMD by other districts at the time of the effective date of the Reclamation and Development Act. In light of this the Department contends that an inclusion of additional solid waste streams not statutorily mandated would reduce the remaining useful life of available HMD landfill capacity to a dangerously low level. DEP also maintains that a policy allowing Union to continue its dumping in the HMD would be tantamount to an endorsement of an existing attitude among districts that envisions the Hackensack Meadowlands region as the dumping ground for New Jersey. This in turn would reduce the incentive of other districts to become more efficient in their disposal strategies and to develop alternative solutions to solid waste disposal. Finally, the Department states that continued large scale dumping in the HMD would have a general detrimental effect on land development and environmental quality in the Meadowlands region.

The major terms of the regulations, in pertinent part, may be summarized as follows:

---

[9]Prior to the promulgation of the regulations, Union County had been depositing 60% of its waste in the HMD. The solid waste management plan initially developed by Union called for the continued disposal of Union waste in the HMD for a four-to-six year period until resource recovery could be achieved in Union. At the same time, the plan initially adopted by HMD explicitly called for the exclusion of Union waste flow streams. In essence, the regulations embrace the HMD proposal, inasmuch as they mandate the redirection of waste flows away from the Hackensack Meadowlands. Appellants' arguments in opposition to the regulations focus principally on the deleterious economic effects that they argue are likely to result from the solid waste flow redirection. Appellants also object to the amount of time—18 days—in which they were directed to reach an agreement with Middlesex providing for the disposal of more than half of Union's waste at Middlesex sites until the year 2000.

(1) Union and Middlesex shall, by February 19, 1980, negotiate a 20 year agreement for disposal in Middlesex of waste from 17 specified Union communities, including Elizabeth and Kenilworth. The agreement may make provision for the development of resource recovery in Union, but only insofar as it does not interfere with the reasonable development of resource recovery in Middlesex.[10] *N.J.A.C.* 7:26–1.11(e)(1).

(2) Similar so-called "long-term agreements" are required between Union and Morris and Essex Counties for disposal of waste from several specified Union communities. *N.J.A.C.* 7:26–1.11(e)(2) and (3).

(3) All Districts are to submit plans in compliance with the regulations by July 1980. *N.J.A.C.* 7:26–1.12(a).

The regulations also provide the Department with certain powers purported to be necessary and incidental to the legislative intent manifested in the Act. In this regard the regulations provide as follows:

The department and/or any solid waste management district may where necessary in developing a district or state-wide solid waste management plan or in affecting compliance therewith designate any solid waste transfer, disposal or resource recovery facility to receive specific waste streams. This designation may take into consideration the designated facility's environmental soundness, geographic location, existing loading rate (including traffic impact), remaining design capacity, and prior history of compliance with operating and engineering design rules.

The Department and/or any solid waste management district may where necessary in developing a district or state-wide management plan or in affecting [sic: effecting] compliance therewith require any person registered with the department for the collection and transportation of solid wastes to transport such solid waste to solid waste facilities designated in an approved district solid waste management plan or in the state-wide solid waste management plan for receipt thereof.

[*N.J.A.C.* 7:26–1.13(a) and (b).]

Union and Middlesex failed to adopt amended plans in response to the DEP's modifications, as required by *N.J.S.A.* 13:1E–24. As a result, on March 10, 1980, DEP itself promulgated those portions of the plans dealing with the redirection of solid waste flow streams originating from Union County. The

---

[10]This aspect of the regulations has been superseded by the final modification of the Union plan adopted by the DEP. That modification provides that waste from 10 of the 17 municipalities to be covered by the Union/Middlesex agreement be directed to the Union resource recovery facility when it is ready.

Department's promulgation of those plans in lieu of Union's failure to act amounted to an implementation of the challenged regulations.

## II

As indicated above, the planning role of DEP is central to the Act. In this regard the Department is required to

[d]evelop, formulate, promulgate and review for the purposes of revising or updating not less than once every 2 years, a Statewide solid waste management plan * * * which shall provide the objectives, criteria and standards for the evaluation of [the district] plans * * * and to the extent practicable, encourage and assist in the development and formulation of such solid waste management plans and guidelines to implement such plans.

[*N.J.S.A.* 13:1E–6(a)(3).]

In charging DEP with the responsibility for formulating a statewide plan, the legislature has provided a centralized touchstone designed to assist the districts in the formulation of their individual solid waste management plans, and has provided a standard to be used by the Department in its review and evaluation of these plans. In short, the statewide plan developed by the Department sets the tone for and initiates the entire planning process envisioned by the Act.

Appellants argue that DEP's power to modify district solid waste management plans may be exercised only in accordance with DEP's statewide plan. They contend that the requirement that the Department formulate such a plan amounts to a condition precedent to DEP action under the Act, and that since no statewide plan exists, the Department was precluded from issuing the modification of the Union plan and promulgating the disputed regulations.

For the purposes of this appeal, the Department has identified four documents or sets of documents as together comprising the required statewide plan: (1) "Guidelines for the Development and Formulation of District Solid Waste Management Plans"; (2) a number of management manuals, each of which discusses an aspect of district planning; (3) "Policy and Procedures for Review of District Solid Waste Management Plans"; and (4) the regulations at issue here.

The Act provides no specific criteria by which to evaluate the sufficiency of the DEP statewide plan. In the absence of such direction, we perceive that *N.J.S.A.* 13:1E–6(a)(3) suggests a functional approach, bearing upon (1) whether the plan, within 180 days of the effective date of the amended Act, provided an adequate basis for the preparation of district plans, and (2) whether the documents in existence at the time the Department began its review of the district plans provided a reasonably adequate basis upon which to conduct that review.

Our careful review of the documents identified by DEP as constituting the statewide plan leads us to conclude that the Department has met its statutory responsibilities set forth in *N.J.S.A.* 13:1E–6(a)(3). However, even though these documents provide sufficient "objectives, criteria and standards," *id.*, for the purposes envisioned by the Act, there has been only minimal compliance in this case. We do not view *N.J.S.A.* 13:1E–6(a)(3) as encouraging the piecemeal submission of a statewide plan by DEP. Moreover, the districts should not have to engage in a guessing game in order to ascertain which documents constitute the plan. Accordingly, the Department is directed to reduce the statewide plan to an identifiable and manageable document within 30 days of this decision. However, because the documents identified by the Department appear to meet the substantive aspects envisioned by the Act, we find that their provisions may be included in the statewide plan to the extent that they are found appropriate by the DEP in the exercise of its discretion under the Act.

### III

Appellants also maintain that the regulations go beyond those powers granted to the Department by the Act and are in contravention of the exclusive powers vested in the BPU by virtue of the Solid Waste Utility and Control Act, *N.J.S.A.* 48:13A–1 to –13 (Utility Act), which authorizes the BPU to establish franchise areas for solid waste collection and disposal.

In particular, appellants contend that inasmuch as the regulations constitute an attempt by DEP to direct specific solid waste flow streams to specific disposal sites and to direct specific solid waste collectors to transport these streams to the sites so designated, they are *ultra vires* and repugnant to the provisions of the Utility Act.

DEP maintains neither that the Solid Waste Management Act explicitly provides for the Department's redirection of specific waste flow streams, nor that the Act expressly sanctions the designation of specific solid waste collectors to transport such solid waste streams. Rather, the Department argues that the Act, when viewed as a whole, clearly contemplates DEP planning and direction regarding interdistrict waste flow.

It is evident from the Utility Act and the Solid Waste Management Act that the legislature envisioned complementary functions for DEP and BPU regarding the designation of interdistrict waste flow routes.[11] See also *City of Hackensack v. Winner*, 82 *N.J.* 1, 21–27 (1980); *Hinfey v. Matawan Regional Bd. of Educ.*, 77 *N.J.* 514, 531 (1978). The Utility Act was enacted simultaneously with the Solid Waste Management Act and each was substantially amended in 1975 by the passage of *L. 1975, c. 326.* It is apparent from the provisions of each act, however, that the roles of DEP and BPU were to be distinct as to certain aspects of solid waste management.

The Utility Act makes clear that BPU's role in statewide solid waste management is to assess and regulate the economic aspects of the solid waste disposal industry. *N.J.S.A.* 48:13A–2. That enactment empowers BPU to designate any municipality as a franchise area:

---

[11]Currently before the State legislature is *S*–1272 (1982). The bill establishes in DEP the authority to regulate and oversee *all* aspects of solid waste management, including the regulatory powers administered at the present time by BPU by virtue of the Utility Act. See also *A*–71 (1982) and *S*–263 (1982).

The Board of Public Utility Commissioners shall, after hearing, by order in writing, when it finds that the public interest requires, designate any municipality as a franchise area to be served by one or more persons engaged in solid waste collection and any solid waste management district as a franchise area to be served by one or more persons engaged in solid waste disposal at rates and charges published in tariffs or contracts accepted for filing by the board; provided, however, that the proposed franchise area for solid waste collection or for solid waste disposal conforms to the solid waste management plan of the solid waste management district in which such franchise area is to be located, as such plan shall have been approved by the Department of Environmental Protection.

 * * * * * * * *

[*N.J.S.A.* 48:13A–5.]

That same section goes on to provide that "[n]othing in section 11 of this act (C. 48:13A–10) shall be interpreted to prevent the implementation of this section by the Board of Public Utility Commissioners." *Id.* The cross reference to *N.J.S.A.* 48:13A–10, the Utility Act's anti-monopolization provision, contains the following:

a. No person shall monopolize, or attempt to monopolize, or combine or conspire with any other person to monopolize, trade or commerce in any relevant market, located in whole or in part in this State, for the solid waste collection business or the solid waste disposal business.

b. Any person who shall be injured in his business or property by reason of a violation of the provisions of subsection a. of this section may sue therefore and shall recover threefold the damages sustained by him, together with reasonable attorney's fees and the costs of the suit. *The State and any of its political subdivisions and public agencies shall be deemed a person within the meaning of this act.* Any action brought pursuant to this subsection shall be barred unless commenced within 4 years after the cause of action accrues.

 * * * * * * * *

[*Id.* (emphasis added).]

Appellants contend that these provisions combine to preclude DEP and the districts from directing interdistrict waste flows in the manner provided by *N.J.A.C.* 7:26–1.13(a) and (b). They also maintain that the requirement that certain Union County municipalities enter into long-term agreements for the disposal of their waste at specific Middlesex County facilities, see *N.J. A.C.* 7:26–1.11(e)(1), likewise runs afoul of *N.J.S.A.* 48:13A–10.

DEP responds that the Act plainly contemplates DEP planning and direction regarding interdistrict waste flow and that such authority is reasonably incidental to its ability to effectuate fully the legislative intent underlying the Act. The Department also points to *N.J.S.A.* 48:13A–5, which was amended in 1975 to provide that franchise areas designated by the BPU must be in compliance with the pertinent district solid waste management plan.

We recently addressed a factual complex in which the statutory authority for an administrative agency action was not expressly stated in the enabling legislation, yet the action furthered the policies and findings that motivated the enactment of that legislation. See *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544 (1978). There the Court upheld the adoption and promulgation of a comprehensive regulatory scheme that sought to curb certain abuses within the hearing aid business. Justice Pashman, writing for a unanimous Court, extensively outlined the framework within which to evaluate the validity of administrative rulemaking:

> The authority possessed by an administrative agency " * * * consists of the powers expressly granted which in turn are attended by those incidental powers which are reasonably necessary or appropriate to effectuate the specific delegation." This Court has held that the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and that the courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent.
>
> * * * * * * *
>
> In determining whether a particular administrative act enjoys statutory authorization, the reviewing court may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives.
>
> [*Id.* at 562 (citations omitted).]

 Administrative regulations are "customarily" afforded a "rebuttable presumption of validity." *Motyka v. M'Corkle*, 58 *N.J.* 165, 181 (1971), as a result of which "an *ultra vires* finding is disfavored." *New Jersey Guild, supra*, 75 *N.J.* at 561. Moreover, the absence of an express statutory authorization in the enabling legislation will not preclude administrative agency

action where, by reasonable implication, that action can be said to promote or advance the policies and findings that served as the driving force for the enactment of the legislation. See *id.* at 562; *In re Suspension of Heller*, 73 *N.J.* 292, 303–04 (1977). Equally important, however, is a court's responsibility to restrain agency action "[w]here there exists reasonable doubt as to whether such power is vested in the administrative body." *In re Jamesburg High School Closing*, 83 *N.J.* 540, 549 (1980). Where such doubt exists, and where the enabling legislation cannot fairly be said to authorize the agency action in question, the power is denied. *Id.* See also *Burlington County Evergreen Park Mental Hospital v. Cooper*, 56 *N.J.* 579, 598 (1970); *Swede v. City of Clifton*, 22 *N.J.* 303, 312 (1956).

■ Turning to the specific statutory scheme of the instant cases, we conclude that DEP acted within its statutory mandate in promulgating the interdistrict waste flow rules insofar as the rules authorize the Department generally to direct the interdistrict flow of solid waste streams. That authority can fairly be said to stem from those incidental powers that are necessary to effectuate fully the legislative purpose underlying the Act.[12]

---

[12]Several provisions of the Act, in addition to *N.J.S.A.* 48:13A–5, suggest that this power was intended by the legislature to be vested in DEP. Initially, the legislative findings and declaration of policy that introduce the Act criticize in part "the failure of the State to establish guidelines for the preparation of county and intercounty plans, and the failure to implement county and intercounty solid waste collection, disposal and utilization operations." *N.J.S.A.* 13:1E–2(a). Additionally, the Act explicitly declares as the icy of New Jersey the "[e]stablish[ment] [of] a statutory framework within w.ich all solid waste collection, disposal and utilization activity may be coordinated." *N.J.S.A.* 13:1E–2(b)(1).

Finally, the Act encourages resource recovery as a means of solid waste disposal "through the development of systems to collect, separate, recycle and recover metals, glass, paper and other materials of value for reuse or for energy production." *N.J.S.A.* 13:1E–2(b)(7). The fact that in order successfully to implement resource recovery, the resource recovery facility must be able to enter into long term contracts with municipalities and other solid waste collectors to guarantee the continued flow of solid waste,

■ Even though the Act can fairly be said to contemplate DEP authority generally to direct the interdistrict flow of waste, the regulations as promulgated here exceed that authority. Specifically, DEP has promulgated regulations that require any person registered as a solid waste collector or transporter to transport specific waste flow streams, *N.J.A.C.* 7:26–1.13(b), and that require any solid waste transfer, disposal or resource recovery facility to receive specific waste streams, *N.J.A.C.* 7:26–1.-13(a).

As to this exercise of authority, there is reasonable doubt as to whether the Act can fairly be said to authorize that DEP action. See *In re Jamesburg High School Closing, supra,* 83 *N.J.* at 549. That doubt is created largely by the fact that the Utility Act endows BPU with a broad range of powers to regulate those economic factors that pervade the solid waste management industry, particularly those who engage directly in the business of solid waste collection or solid waste disposal. See *N.J.S.A.* 48:13A–2, –7 and –10. Moreover, we have repeatedly held that BPU was intended by the legislature to have the widest range of regulatory power over public utilities. See *Twp. of Deptford v. Woodbury Ter. Sewerage Corp.,* 54 *N.J.* 418, 424 (1969); *In re Public Service Electric and Gas Co.,* 35 *N.J.* 358, 371 (1961). The Department of Public Utilities Act of 1948 was amended by *L.* 1970, *c.* 40, § 4, to include within the definition of public utilities those business entities, such as the disposal and collector appellants here, that engage in solid waste collection and solid waste disposal. *N.J.S.A.* 48:2–13. And the legislature has given the BPU the authority to require, after a hearing, that any public utility "furnish safe, adequate and proper service, including furnishing and performance of service in a manner than tends to conserve and preserve the quality of the environment and prevent the pollution of the waters, land and air of this State * * *." *N.J.S.A.* 48:2–23.

---

suggests that the legislature intended that DEP be empowered to direct generally the interdistrict flow of solid waste.

These circumstances lead us to conclude that DEP has the authority under the Solid Waste Management Act to provide general direction with respect to interdistrict waste flow. By "general direction" we mean the power to assess the solid waste disposal capacities of each of the solid waste management districts and to direct any district to dispose of its waste in any other district. That power can be said reasonably to flow from the Act.

On the other hand, the authority to direct individual solid waste collectors to collect and transport waste streams to specific disposal sites and require or designate specific disposal facilities as the ultimate destination of particular waste streams is more appropriately within the realm of BPU, given its responsibility to weigh and regulate the economic aspects of the solid waste industry. If specific resource recovery plants or other collectors or disposal facilities believe that they need a franchise grant to assure economic survival, they should apply to the BPU on a case-by-case basis.

## IV

Appellants next argue that by imposing the regulations on the districts during district planning, DEP has undercut the structured planning scheme established by the Act. They assert that several portions of the statutory planning mechanism have been encumbered, in that (1) the districts have lost their primacy with respect to the generation of management solutions; (2) the private collection and disposal industry, explicitly integrated into the planning structure by *N.J.S.A.* 13:1E–20(b)(1), has lost its planning role to the same extent that the districts have lost theirs; (3) interested persons have lost their ability to file written comments to proposed district plans via *N.J.S.A.* 13:1E–23(e); and (4) BPU has lost its ability to comment on the economic aspects of proposed district plans through *N.J.S.A.* 13:1E–24(a)(3).

We have reviewed each of these contentions and find them to be without merit. The Department has received extensive comment on the proposed regulations from various levels of the statutory planning structure, including the Solid Waste Management Districts, various municipalities, and the private industry appellants. It is also significant that in its original certifications of modification of the Union, Middlesex and HMDC plans, the Department ordered public hearings pursuant to *N.J.S.A.* 13:1E–24(d), thereby allowing the districts and all interested participants the opportunity to study and implement the interdistrict waste flow patterns.

The Act addresses a pronounced need for uniformity and local, regional, and statewide integration in the regulation of solid waste management. It is obvious that "the Legislature intended to vest in the Department great supervisory powers over the critical and urgent need for solid waste disposal." *In re Application Combustion Associates,* 169 *N.J.Super.* 305, 316 (App.Div. 1979). The Department's imposition of the regulations in its modifications of the districts' plans did not exceed this statutory mandate.[13]

Appellants' final argument is that the regulations are arbitrary and capricious because they are not based upon sufficiently credible evidence in the record. Cases in support of the principle that a strong presumption of reasonableness attaches to administrative action are legion. *E.g., Smith v. Ricci,* 89 *N.J.* 514 (1982); *Newark v. National Resource Council, supra,* 82 *N.J.* at 539; *New Jersey Guild, supra,* 75 *N.J.* at 560–63; *Consolidation Coal Co. v. Kandle,* 105 *N.J.Super.* 104, 113–120 (App.Div.) aff'd o.b., 54 *N.J.* 11 (1969). As to those parts of the regulations that we have held to be valid, we conclude that the record reveals an ample factual basis for the general redirection of district waste flow streams.

---

[13]Our conclusion in this regard is constrained by our finding that sustains the regulations only insofar as they allow the Department to direct general interdistrict waste flows.

The regulations are affirmed in part and stricken in part, as set forth herein.

## V

The Solid Waste Management Act authorizes the DEP generally to direct the interdistrict flow of solid waste. That authority is implicit in the Act and involves primarily an environmental decision. The Solid Waste Utility and Control Act authorizes BPU to regulate among other things, the economic factors that extend throughout the solid waste management industry. See *supra* at 684–685 (slip op. at 28–29). That authority involves the assessment of the economic repercussions that may result as a consequence of the interdistrict waste flow strategy formulated by DEP, particularly in respect of the individual participants in the solid waste disposal and collection industry.

Consistent with the foregoing, the cases are remanded to DEP for an administrative hearing pursuant to *N.J.S.A.* 52:14B–4, to be conducted within 45 days of this decision. Representatives from each of the appellants, as well as BPU, shall participate. Within 15 days of the conclusion of that hearing, the Department is to develop an interdistrict waste flow order in accordance with its statutory responsibilities as defined herein. Within five days thereafter, BPU is to conduct a hearing pursuant to *N.J.S.A.* 48:13A–5, after which it shall, if it finds "the public interest requires," designate the solid waste collectors and disposal facilities that will be required to collect, transport and receive the solid waste that has been redirected as a result of the above mentioned interdistrict waste flow order. The record developed at the DEP hearing should serve as the basis for the BPU proceedings.

Because these hearings are substantially contemporaneous, and inasmuch as they involve the same subject matter, albeit different aspects of the underlying problem, we leave it to DEP and BPU to decide whether in the alternative to conduct one joint administrative hearing. Whichever course the agencies

decide on, their decision should focus principally on which alternative will bring about the most expeditious result.

Within 45 days after the conclusion of either the successive DEP, BPU hearings or the joint DEP–BPU hearing, DEP shall formulate a final interdistrict solid waste flow strategy, which shall reflect both DEP's findings and BPU's designation of those collection and disposal facilities required to collect, transport and receive the solid waste flows. In the interim the regulations as originally promulgated by DEP remain in full force and effect. We do not retain jurisdiction.

So ordered.

*For affirmance in part, reversal in part and remandment* —Chief Justice WILENTZ, Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—6.

*Opposed*—None.