679 A.2d 613

HOLGATE PROPERTY ASSOCIATES, A NEW JERSEY PARTNER-SHIP, PLAINTIFF–APPELLANT, v. TOWNSHIP OF HOWELL AND THOMAS SAVINO, ENGINEERING COORDINATOR, DE-FENDANTS–RESPONDENTS, AND ZONING BOARD OF AD-JUSTMENT OF HOWELL TOWNSHIP, DEFENDANT.

Argued March 12, 1996—Decided July 29, 1996.

*Nancy G. Wright* argued the cause for appellant (*Bathgate, Wegener & Wolf,* attorneys).

*Dennis M. Crawford* argued the cause for respondents (*McLaughlin, Bennett, Gelson & Cramer,* attorneys; *William P. Gilroy,* on the brief).

*Judeth Piccinini Yeany,* Deputy Attorney General, argued the cause for amicus curiae, State of New Jersey, Department of

Environmental Protection (*Deborah T. Poritz*, Attorney General of New Jersey, attorney; *Mary C. Jacobson*, Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

HANDLER, J.

In this case, the Department of Environmental Protection authorized a property owner to use a sludge-derived product to make topsoil at a site that had long been used for soil removal. As a result of complaints by neighbors regarding the smell and concerns expressed about contamination of the water supply, the municipality in which the site was located issued an order prohibiting the owner from further use of the sludge-derived product. It also required the owner to apply for authorization for that use of its property under the local zoning laws.

The issue in this case is whether use of the property involving a sludge-derived product is eligible for exemption by the Department of Environmental Protection from the formal permitting requirements of the Solid Waste Management Act. Resolution of that issue is significant because it will define the extent to which formal notification and the participation of the public are necessary conditions for state authorization of the disposition and use of sludge-derived products. A related issue is whether the Solid Waste Management Act, in its application to sludge-derived products, preempts local zoning and other police power laws, and thus bars the exercise of municipal authority over activities involving sludge-derived products.

I

Holgate Property Associates ("Holgate") owned property in Howell Township ("the Township"), which had been used as a sand and gravel quarry since 1930. Holgate operated the property for over ten years pursuant to a township soil-removal permit, issued in accordance with the local soil-removal ordinance, which allowed such activity as a permitted non-conforming use. Holgate had

used the property for both soil removal and clay and topsoil mixing, and had made large distributions of soil to the Lone Pine Landfill in Monmouth County. In 1989, Holgate transported composted sludge to its quarry from Philadelphia to use as a soil conditioner to reclaim the land on a part of its property. The Department of Environmental Protection ("DEP") authorized a permit exemption for that activity, denominated as "NJPDES Permit Exemption to Utilize Compost Generated by the City of Philadelphia at the Holgate Property Associates Sand and Gravel Pit as a Soil Amendment for Reclamation and Revegetation." The DEP provided the Township with a copy of the exemption. The Township apparently made no objection at the time.

The Middlesex County Utilities Authority ("MCUA"), operates a sludge-processing facility. On February 26, 1991, the DEP issued a NJPDES permit authorizing the MCUA to process sludge and to distribute the resulting sludge-derived product ("SDP"). The DEP also issued a separate permit authorizing the MCUA to "Produce and Store Sludge–Derived Product Mixtures" at the Holgate property "for the Distribution to Landscapers and Other End Users."

Pursuant to those permits, Holgate began to transport SDP from the MCUA facility to its quarry for use in mixing with sand and topsoil. Under the permit, Holgate was authorized to take up to 100,000 cubic yards of the product. Holgate estimated that this arrangement saved the taxpayers $10 million in disposal costs. Most of the product created by mixing the SDP with clay and soil went to the Lone Pine Landfill for fill and reclamation.

In July 1993, residents living near the quarry noticed the trucking and storage of SDP at the quarry, and observed mounds of SDP estimated at 80 feet high, 200 feet wide, and 400 feet deep. Neighbors complained of strong odors and contended that SDP-runoff was finding its way into nearby streams. The Township scheduled a meeting with Holgate to discuss its operations at the quarry. Approximately ten minutes before that meeting was to begin on August 9, 1993, the Township served Holgate with a Stop

Work Order, which required Holgate to "apply to the Zoning Board of Adjustment for an interpretation and/or use variance for this procedure.... within 10 days from your receipt of this letter." On August 18, Holgate filed an interpretation application with the Township Zoning Board, and a hearing was scheduled for September 21, 1993. Meanwhile, Holgate continued to receive and process SDP from the MCUA.

A day before the hearing was scheduled, Holgate filed a complaint in support of an Order to Show Cause seeking to enjoin enforcement of the Stop Work Order and to obtain a declaration that the Solid Waste Management Act, *N.J.S.A.* 13:1E–1 to 207, ("SWMA") preempted the Township from enforcing its zoning and soil removal ordinances. The court held a hearing on the preemption issue on October 4, 1993.

The court examined the regulatory scheme pertaining to sludge and sludge-derived products. It noted that the SWMA explicitly deems the DEP responsible for sludge management through the Statewide Sludge Management Plan ("SSMP"), district level plans, and permits. It further found that the permitting process is geared toward achieving DEP's mandate to maximize statewide processing of sludge into useful fertilizer. Toward that end, the court found that the permits are designed both to ensure compliance with water quality standards and effluent limitations at the permitted site and to set standards for maintaining the quality of the SDP at the production site.

The court noted that the permit allowing sludge generation and processing includes an approved distribution plan. Further, the court noted that the site set to receive the SDP must receive a similar permit before beginning to accept sludge or SDP. The court emphasized that it is the sludge generator (rather than the recipient of sludge or SDP) that is responsible for complying with DEP regulations and permits and for maintaining the quality of the sludge or SDP.

The court also concluded that the SWMA generally preempts other local government regulation, because it presents a compre-

hensive statutory and regulatory scheme that completely occupies the field of solid waste management, even though general statutory authority exists for local regulation of health and safety issues. The court cited numerous cases holding SWMA preemptive of local attempts to regulate solid waste facilities and concluded:

> It is clear therefore, that both the land application of sludge and the distribution of sludge-derived product are subject to pervasive regulation by the State under the Water Pollution Control Act and the Solid Waste Management Act, and that the State's sludge management scheme is so comprehensive as to effectively preclude municipal regulation.

The court then ruled that the Stop Work Order was an attempt to regulate sludge management that conflicted with the legislative scheme and obstructed the legislative objective of a comprehensive statewide approach to sludge management, and therefore was preempted. The court restrained enforcement of the Stop Work Order, and the Township appealed.

The Appellate Division reversed. 283 *N.J.Super.* 311, 661 *A.*2d 1305 (App.Div.1995). The court framed the issue in terms of the procedural requirements that the DEP must fulfill for its decisions to have preemptive effect over municipal zoning laws in respect of a site used for the processing and disposition of SDPs. *Id.* at 313, 661 *A.*2d 1305. It concluded that the requirements for the management of solid waste are equally applicable to SDPs. *See id.* at 321–22, 661 *A.*2d 1305.

The essential holding of the Appellate Division is that the SWMA does not by itself preempt local regulation; rather, it is the adoption of the district plan (including the mandated public hearings and comment period) under the SWMA that gives the SWMA preemptive effect. *Id.* at 319, 661 *A.*2d 1305. Therefore, the court concluded that the DEP, though having the interim or transitional power, in the absence of a district plan, to approve a site for SDP processing, does not thereby preempt local authority over such activities unless it complies with the "basic planning procedures and criteria of the SWMA before approving a facility." *Id.* at 321, 661 *A.*2d 1305. The court believed that its interpretation would reduce the risk that interim approval of a site would

conflict with the district plan. *Ibid.* Applying that interpretation to the facts, the court concluded that the DEP failed to conform with the SWMA because the MCUA's permit exemption application did not provide adequate information for the DEP to consider local concerns, and the DEP did not consult with the Township or the district's advisory solid waste council, or hold a public hearing as otherwise required under the SWMA. *Id.* at 322, 661 *A.*2d 1305; *see also N.J.S.A.* 13:1E–2b(1), 13:1E–20b(2)(c), 13:1E–23c, 13:1E–45c.

The Court granted Holgate's petition for certification, which the DEP joined. 143 *N.J.* 321, 670 *A.*2d 1063 (1995).

## II

It is clear that in passing the SWMA, the Legislature understood that the management of solid waste affects matters of public policy and important concerns relating to the public health, safety and welfare. *A.A. Mastrangelo, Inc. v. Dep't of Envtl. Protection,* 90 *N.J.* 666, 670, 449 *A.*2d 516 (1982). It recognized that the management of solid waste should be coordinated as a statewide system and that it entails a degree of expertise that transcends the capacities and interests of local government. *N.J.S.A.* 13:1E–2a. Nevertheless, the Legislature appreciated the significant impact that state-level decisions governing the management of solid waste would have throughout the state. It therefore required that the management of solid waste must be effectuated at the local level and must involve maximum government and public participation at that level. *N.J.S.A.* 13:1E–2b. The SWMA contemplates local participation in management decisions through local solid waste districts, which are charged with the responsibility to develop a solid waste management plan. *N.J.S.A.* 13:1E–2b(2). The Act also mandates public participation to be accomplished by public notice and public hearings and comment periods, as well as consultation with district councils consisting of water and waste agency members, mayors and environmentalists. *N.J.S.A.* 13:1E–2b(3), 13:1E–7, 13:1E–20, 13:1E–23. It also envi-

sions the inclusion of the solid waste industry in the decisional process in recognition of the relevance of marketing concerns and market dynamics in the management and disposition of solid waste. *N.J.S.A.* 13:1E–2b(5), 13:1E–20b(1).

The DEP is primarily responsible for the regulation of solid waste management, through development of a statewide plan, and through regulatory and supervisory control of new and existing facilities. *N.J.S.A.* 13:1E–4, 13:1E–6. Most regulation is accomplished through the registration and permit system. *See ibid.* The DEP has exempted certain types of facilities, however, including those engaging in the land application of certain non-hazardous wastes, including some SDPs, because they pose little or no threat to human health or the environment. *N.J.A.C.* 7:26–1.8; *see also N.J.S.A.* 13:1E–4a. Those facilities are still required to obtain a NJPDES permit, however. *N.J.A.C.* 7:26–1.8; *see also N.J.A.C.* 7:14A.

Statewide Sludge Management Plans were adopted in 1987 and 1993. Those plans, when considered in combination with the 1977 amendments to the SWMA (the so-called "sludge amendments"), *N.J.S.A.* 13:1E–43 to –48, demonstrate that, as a critical component of the legislative and administrative scheme for the management of solid waste sludge, the Legislature contemplated and anticipated that sludge would be converted into products that are environmentally benign and economically beneficial. In that vein, the DEP specifically was charged with including in its statewide plan provisions to ensure the adequate utilization of sludge processing technologies (*e.g.,* using sludge to generate heat or energy, or to create fertilizer) and land disposal techniques. *N.J.S.A.* 13:1E–43b, 13:1E–44b, 13:1E–45e. To avoid the primary environmental risk posed by land application of sludge—contamination of the ground and surface water—the Legislature required that sludge that meets DEP criteria for land application "shall be of sufficient quality to be disposed of in a land-based manner without degrading the environment or posing a threat to human health." *N.J.S.A.* 58:10A–40.

The Legislature's scheme for sludge management contemplates that a SDP that meets certain requirements is essentially a beneficial product and therefore is not subject to extensive regulation. The main regulatory effort in connection with SDPs is to ensure that sludge as such will not be mishandled. The effort is focused on supervising sludge processors to ensure that they produce sludge products that conform to the land-application standards. Nevertheless, land-application sites are an important part of the overall scheme of handling and disposing sludge through conversion into SDPs. Hence, to protect ground and surface water, sites where SDPs are handled, stored, or disposed are required to obtain a NJPDES permit.

Both the DEP and Holgate argue that the Appellate Division equated "sludge-derived products" with "sludge," perceiving the two as similar in terms of their potential impact on the environment and the public. They point out that the opinion frequently refers to the Holgate operation as a "sludge processing facility" engaged in operations like "mixing sludge with clay." *See* 283 *N.J.Super.* at 313, 317–18, 322, 661 *A.2d* 1305.

The Appellate Division seemingly did misapprehend the critical differences between sludge and sludge-derived products. As a result, the appellate court failed to stress the policies underlying the SWMA's treatment of sludge, and, particularly, the importance of SDPs as the means through which sludge can be effectively managed and ultimately disposed. The Appellate Division thus underemphasized the technologies designed to encourage and provide beneficial, useful and safe ways to dispose sludge. The court, similarly failed to appreciate the legislative and administrative policies of facilitating free-market methods to address solid-waste management difficulties through the conversion of sludge into SDPs that have commercial value.

The Appellate Division found that in approving Holgate as an SDP distribution center, the DEP failed to comply with the SWMA's public participation requirements, which it found are applicable when no district sludge management plan is in place.

283 *N.J.Super.* at 321–22, 661 *A.*2d 1305; *see also N.J.S.A.* 13:1E–23. Holgate and the DEP argue that the public participation requirements that arise in the absence of a district sludge management plan are applicable only to sludge and do not apply to SDP distribution sites, the operation of which may be authorized through the granting of a permit exemption. They also contend that it does not matter whether a district sludge plan exists for the purpose of granting a permit exemption for SDP distribution activities because the inclusion of the SDP site in the sludge-site inventory would not be required under the SWMA. That is in contrast to sludge sources and sludge processing and disposal sites, the inclusion of which would be required. *N.J.S.A.* 13:1E–45a; 13:1E–45c.

We conclude that the approval of a permit exemption for the operation of a SDP site does not require the public-notice procedures applicable to the approval of a solid waste facility. Under the SWMA, the individual-site approvals of SDP sites do not invoke, and should not be hampered by, the procedural requirements otherwise applicable to solid-waste facilities.

■ Consistent with the legislative scheme of the SWMA, there should be substantial deference afforded to the DEP as the administrative agency charged with the regulation of the operations of entities disposing of SDPs. *See Greenwood v. State Police Training Center,* 127 *N.J.* 500, 513, 606 *A.*2d 336 (1992); *Public Serv. Elec. & Gas Co. v. New Jersey Dep't of Envtl. Protection,* 101 *N.J.* 95, 103, 501 *A.*2d 125 (1985); *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980). We impute to the DEP the specialized expertise in this area that reflects its administrative authority and responsibilities. The DEP's granting of a permit exemption need not involve the actual participation by local government through formal notice and structured public hearings. As the DEP points out, the formal procedures established for approving plans of sludge processing and sludge disposal facilities are inappropriate for the regulation of the distribution of SDPs, products that are essentially regulated as fertilizer. The

imposition of those formal procedural requirements will create substantial difficulties in locating and approving SDP distribution centers, severely interfering with the disposition of SDPs and, ultimately, with the handling and disposition of sludge itself. It would have the potential, as observed by the DEP, to lead to disastrous results because over one hundred SDP disposal sites around the state would become subject to heavy regulation entailing extensive local participation.

The DEP's regulations are within its delegated authority under the statute, and thus are to be afforded deference. Further, those regulations evidence a contemporaneous administrative construction and understanding of the law that serves as an informed interpretation of those laws. *See Cedar Cove, Inc. v. Stanzione*, 122 *N.J.* 202, 212, 584 *A.*2d 784 (1991); *Smith v. Director, Div. of Taxation*, 108 *N.J.* 19, 25–26, 527 *A.*2d 843 (1987). The long usage and historical exemption of SDP distribution sites are a practical application of the statute that further confirms its contemporaneous construction by the DEP.

### III

The question may fairly be raised, however, whether the failure to consider municipal zoning and land-use regulations applicable to the proposed SDP-distribution site and other local health and safety concerns related to the proposed use of such a site can constitute a sound exercise of administrative discretion. Although the statute and regulations do not require formal public notice or participation in the approval process by local government and the public, we find that there is an implied duty on the part of the DEP to consider local concerns that will be affected by the operation at the proposed site.

An implied duty of a state administrative agency to give notice to the public may be recognized where the exercise of that agency's powers has a distinctive impact on a particular locality and its citizens. In *Citizens for Equity v. Department of Environmental Protection*, 126 *N.J.* 391, 599 *A.*2d 507 (1991), we

considered the question of whether the DEP should have given notice to affected claimants when it suspended the processing of claims on the Sanitary Landfill Contingency Fund, *N.J.S.A.* 13:1E–100 to –116, pending the adoption of new regulations. The new regulations were significantly more onerous than the old, requiring claimants actually to sell their homes to establish diminution of value. *Id.* at 396, 599 *A.*2d 507. The DEP did not provide notice to parties whose claims were pending at the time of the suspension. *Id.* at 393–94, 599 *A.*2d 507. Although we found that the "law did not require public notice or hearing before DEP could suspend the processing of claims for compensation under the Act," we nevertheless held that such notice should have been given. *Id.* at 397, 599 *A.*2d 507. We noted that "government has an overriding obligation to deal forthrightly and fairly with property owners." *Ibid.* That general sense of fairness led us to require notice: "We are persuaded that in these circumstances DEP, irrespective of its statutory exemption, should have notified all claimants that the processing of claims was being temporarily suspended while the agency considered the adoption of the new regulations. Affording claimant such notice is a matter of fairness." *Id.* at 398, 599 *A.*2d 507.

In an earlier case, *Garden State Farms, Inc. v. Bay*, 77 *N.J.* 439, 390 *A.*2d 1177 (1978), we found that although the Legislature intended to vest ultimate authority to supervise the location and regulation of helistops and heliports in the State Transportation Commissioner, it also intended that authority be exercised with due regard for local concerns and after consultation with local officials. *Id.* at 454–56, 390 *A.*2d 1177. We held that "a failure on the Commissioner's part to weigh conscientiously local interests, to examine carefully whether the proposed aviation facility is compatible with the surrounding land uses and to consult the local ordinances and authorities in making its licensing decision would constitute an abuse of discretion." *Id.* at 456, 390 *A.*2d 1177. We placed particular emphasis on local zoning ordinances:

> Especially probative of the vital interests of local government is the municipal zoning ordinance itself.... Clearly [the commissioner] should, at the very least,

acknowledge the relevance of the local zoning ordinance with respect to applications for private heliports and helistops. To this we would add as a material consideration that the Commissioner ought to take into account whether an applicant for a private heliport has availed itself of any right to a variance under the local zoning law and whether an application for a variance should be pursued as a helpful procedure for fleshing out the impact of the proposed facility upon neighboring land uses.

[*Id.* at 455, 390 *A*.2d 1177.]

We find the reasoning of those cases instructive in our consideration of whether there is an implied duty on the part of the DEP to consider and weigh local concerns in the permit exemption process. We consider that issue in light of our conclusion that the SWMA has preempted the area of solid waste management, including the regulation of sludge and sludge-derived products. *See A.A. Mastrangelo, Inc., supra*, 90 *N.J.* at 670, 449 *A*.2d 516.

In passing the SWMA, the Legislature declared that "it is the policy of this State to ... *[p]rovide citizens and municipalities with opportunities to contribute to the development and implementation of solid waste management plans* by requiring public hearings prior to their adoption and by the creation of advisory solid waste councils ...." *N.J.S.A.* 13:1E–2b (emphasis added). That statement of public policy, in our view, places a burden on the DEP to consider local concerns in deciding whether to exempt a certain SDP-using facility from formal permitting requirements.

We conclude that the DEP should give notice to affected municipalities and to consider their public health and safety concerns and zoning and land-use regulations when deciding whether a facility using SDPs will be exempt from permitting requirements. The failure to do so raises the risk that the DEP's ultimate decision will not give sufficient weight to relevant matters affecting appropriate land uses and public health and safety. Such a decision would constitute an abuse of discretion. That requirement, however, does not necessitate a plenary or general public hearing. It will be satisfied so long as the local government and the public are duly notified and given the opportunity to express their views on the proposed use of the site. *See, e.g.,*

*High Horizons Dev. Co. v. Dep't of Transp.,* 120 *N.J.* 40, 52–53, 575 *A.*2d 1360 (1990).

■  In addition, because this opinion announces a new administrative rule that could potentially require DEP to revisit all outstanding permit exemptions, it shall not be given retroactive effect. *See New Jersey Election Law Enforcement Comm'n v. Citizens to Make Mayor–Council Gov't Work,* 107 *N.J.* 380, 387–91, 526 *A.*2d 1069 (1987); *Coons v. American Honda Motor Co.,* 96 *N.J.* 419, 424–30, 476 *A.*2d 763 (1984), *cert. denied,* 469 *U.S.* 1123, 105 *S.Ct.* 808, 83 *L.Ed.*2d 800 (1985).

IV

The judgment of the Appellate Division is reversed.

O'HERN, J., concurring.

I concur in the opinion and judgment of the Court. I write separately simply to observe that the opinion does not suggest or intimate that the Department of Environmental Protection's exclusive authority to regulate the sale and distribution of soil-derived products (SDPs) would enable it to convert a residential neighborhood into a gravel pit, quarry, or nursery. Rather, the effect of the legislative scheme is that if such uses exist in a community, it would not be an abuse of discretion for the DEP to authorize a related SDP use; and, conversely, if such uses are barred, the community could interpose strong and legitimate objections to the introduction of a site for SDPs, and a decision authorizing such a use would be an abuse of discretion.

*For reversal*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—6.

*Opposed*—None.