426

635 A.2d 986

IN RE CERTIFICATE OF NEED APPLICATION
OF CHILTON MEMORIAL HOSPITAL.

Superior Court of New Jersey
Appellate Division

Argued December 1, 1993—Decided December 23, 1993.

Before Judges SHEBELL, LONG and LANDAU.

*William F. Johnson, Jr.*, argued the cause for appellant, St. Joseph's Hospital And Medical Center (*Johnson, Murphy, Hubner, McKeon & Wubbenhorst*, attorneys; *Mr. Johnson* on the brief).

*Donald A. Kessler*, argued the cause for respondent, Chilton Memorial Hospital (*Schwartz, Simon, Edelstein, Celso & Kessler, Mr. Kessler* on the brief).

*Darcy A. Saunders, Deputy Attorney General*, argued the cause for respondent, State Commissioner of Health (*Fred DeVesa, Attorney General; Joseph L. Yannotti, Assistant Attorney General, of counsel; Ms. Saunders* on the brief).

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

This is an appeal, brought by St. Joseph's Hospital and Medical Center (St. Joseph's) of Paterson, from the Commissioner of Health's (Commissioner) approval and modification of certificate of need No. 901018–14–01, granted to Chilton Memorial Hospital (Chilton), to establish radiation therapy services at its Pompton Plains facility. We reverse the Commissioner's November 17, 1992 amendment of the May 16, 1991 order granting the certificate of need and we remand to the Commissioner.

In the spring of 1990, Chilton filed an application for a certificate of need to acquire a linear accelerator radiation therapy device. It was approved by the Health Systems Agency (HSA) II,

Regional Health Planning Council's Board and Review Committee. There were, however, comments and issues raised by the State staff and the Statewide Health Coordinating Council (S.H.C.C.). Based upon these suggestions, Chilton withdrew its application in order to replan and restructure. The President of Chilton, on September 18, 1990, wrote to the President of St. Joseph's advising that Chilton would be submitting a revised certificate of need for a low voltage unit and that Chilton would be interested in developing an affiliation with St. Joseph's. Under the proposal, Chilton would refer super voltage patients and patients requiring surgical radiation to St. Joseph's. The proposal was reiterated in another letter to St. Joseph's on November 8, 1990.

On December 5, 1990, Chilton wrote to the Regional Health Planning Council advising that Chilton and St. Joseph's had worked out an agreement regarding a joint affiliation in order to provide radiation therapy on site at Chilton. The agreement, entitled "Agreement on Principles Related to Joint Radiation Therapy Program Between St. Joseph's Hospital and Medical Center and Chilton Memorial Hospital" (Agreement), provided, among other things, that:

3. St. Joseph's will provide the physicists and *dosimetrists*....

4. The process of *treatment planning* which includes the localization of the tumor on a simulator and a drawing of the fields will be done at *St. Joseph's Hospital and Medical Center.* The treatment will be done at Chilton Memorial Hospital. St. Joseph's simulator is among the first of its sophistication and can outline the shape of a tumor with unprecedented accuracy.

5. All patients requiring part or all of their treatment on a *high energy linear accelerator will be treated at St. Joseph's,* and the contract between Chilton Memorial Hospital and their chief of radiation therapy will specify that this is so.

[Emphasis added.]

According to St. Joseph's, it dropped its opposition to Chilton's application for a certificate of need based on the Agreement formed with Chilton.

On December 5, 1990, Chilton sent a copy of the Agreement to the Chief of Health Policy, Planning and CON Program. In his letter, the President of Chilton stated that Chilton hoped it would

receive a positive recommendation for approval of the application for a certificate of need. He emphasized that no providers of radiation therapy were objecting to the application.

On December 7, 1990, Chilton's attorney wrote to the Chief requesting a waiver from the requirement that all facilities within the region meet minimum utilization requirements prior to approval of the new service. Chilton's attorney referred to Chilton's joint planning with St. Joseph's "to establish a coordinated and cooperative program utilizing a multi-disciplinary approach to the provision of oncology services in the region." He stated, "the Chilton application was revised to provide for the use of a low energy machine (6 mega voltage unit) which would be complementary to the St. Joseph's Radiation Oncology Program since patients requiring the high energy dosage would be treated at St. Joseph's."

On December 21, 1990, Chilton was informed by the Regional Health Planning Council that Chilton's request for oncological services was not approved, but that approval of the waiver was recommended. On January 17, 1991, Chilton wrote to the S.H.C.C. explaining that the Board's vote against its application was due to a misunderstanding that Chilton only had one oncologist, when in fact it had six oncologists.

Also, in the letter, the President of Chilton noted that the New Jersey Department of Health staff and the HSA recommended approval of its application. He reiterated Chilton's joint efforts with St. Joseph's, stating:

> We initiated regionalized planning with St. Joseph's Hospital and Medical Center, and concluded a detailed signed agreement of project principles with them. This included the referral of high energy patients to their facility, and the agreement to have their Medical Director oversee the project's Quality Assurance Program at Chilton.

The President of St. Joseph's, on January 24, 1991, also wrote to the S.H.C.C. urging approval of Chilton's certificate of need, based on St. Joseph's and Chilton's agreement to establish a cooperative oncology department. She added, "all treatment planning will be done at St. Joseph's prior to treatment at Chilton."

On February 20, 1991, the President of St. Joseph's wrote to the President of Chilton advising Chilton that St. Joseph's noticed for the first time that Chilton's certificate of need included a request for a simulator and appropriate treatment planning and quality measurement (dosimetry) equipment. The letter continued:

> At this point, we would just like to let you know that, based on our agreement on principles, the purchase of the simulator and treatment planning and quality measurement equipment at Chilton would be unnecessary *since all treatment planning for the radiotherapy patients coming to Chilton will be done at St. Joseph's.* We simply wanted to draw this to your attention.

[Emphasis added.]

The then-Commissioner, Frances J. Dunston, approved Chilton's certificate of need on March 26, 1991, and granted the waiver from the requirements of *N.J.A.C.* 8:33I–1.3(a) and (b) [1] because Chilton "presented documentation of a working partnership with another provider of the service in HSA I which calls for the referral of all high energy patients to that provider...." She conditioned the approval on the following requirement:

> The applicant must *formalize and implement* the December 3, 1990 agreement entered into between the Chief Executive Officers of Chilton Memorial Hospital and St. Joseph's Hospital and Medical Center prior to initiating operations. Documentation of same must be provided to the Certificate of Need Program. *Failure to satisfy this condition, as determined by the Commissioner of Health, may form a sufficient basis to nullify this approval.*

[Emphasis added.]

The Commissioner's letter stated that a final decision was not yet made because "[t]he HSA has 30 days from receipt of my notice to request a hearing." On May 16, 1991, Commissioner Dunston advised Chilton that the HSA did not request a hearing and the certificate of need was, therefore, formally approved. The Commissioner stated:

---

[1] This regulation, and others cited in this opinion, were in effect at the time of the 1991 grant of the certificate of need. They have subsequently been revised, however, there have been no substantive changes that affect this matter.

Accordingly, I am approving your certificate of need application for the establishment of radiation therapy services through acquisition of a Clinac 6/100 linear accelerator, *a Varian Ximatron-CX simulator, and appropriate treatment planning and quality measurement (dosimetry) equipment.*

[Emphasis added.]

On July 9, 1991, the President of St. Joseph's wrote to Commissioner Dunston to alert her of the inconsistency between the certificate of need approval letter and the Agreement. The letter pointed out that under the Agreement, St. Joseph's would provide the physicists and dosimetrists and also perform the treatment planning, which included the localization of tumors on a simulator and a drawing of the fields. She reminded the Commissioner of the condition that she had earlier put on the approval of the certificate of need.

On June 15, 1992, Commissioner Dunston wrote a letter addressed to both the President of Chilton and the President of St. Joseph's noting that a "very compelling factor" in her decision to approve the certificate of need was that the two hospitals had developed a "working partnership." She stated that the Agreement formed between the two hospitals offered her comfort that approval for the waiver, required by then existing *N.J.A.C.* 8:33I-1.3(d), was appropriate and that St. Joseph's program would not be diminished by the new service at Chilton. The Commissioner also noted that the certificate of need was issued for one year and that by letter dated, March 13, 1992, Chilton had requested a continuance.

The Commissioner reserved a determination on the continuance until after addressing "a matter in the record which causes me concern." The Commissioner explained the matter of concern was the inconsistency between the Agreement and her approval letter. She stated that the approval letter should have *excluded* costs for the simulator, treatment planning, and quality (dosimetry) equipment because under the Agreement on Principles those services were going to be offered at St. Joseph's. She explained that the discrepancy originated from the fact that the original certificate of

need application was submitted *before* the December 3, 1990 Agreement. This, according to Commissioner Dunston, suggested a need for an amendment to the May 16, 1991, approval. The Commissioner stated, "[t]his should be obvious from the fact that I stated as a condition of approval that Chilton must formalize and implement the December 3, 1990 agreement entered into by the two of you prior to initiating operations and that failure to satisfy this condition could form a sufficient basis to nullify the approval." The Commissioner concluded by requesting that the two hospitals "put back on the table" the Agreement, deciding how and where treatment planning will occur, and that they collectively agree whether an amendment to the Agreement is appropriate. She granted Chilton a continuance of its certificate of need until July 15, 1992.

On July 7, 1992, St. Joseph's advised Chilton that St. Joseph's was not willing to amend the Agreement so that a simulator would be located at Chilton, and that the parties should adhere to the Agreement. On July 8, 1992, Commissioner Dunston wrote to both hospitals stating: "[n]o where in my letter [of June 15, 1992] did I suggest or imply that the entire agreement should be the subject of renegotiation and no where did I suggest or imply that Chilton and St. Joseph's should amend the original agreement." She said that amending the Agreement was only appropriate if the two parties "collectively wish to do so." She then gave the parties an extension until August 17, 1992, to report any change to the Agreement they might agree on.

On July 30, 1992, the President of St. Joseph's wrote the Commissioner that St. Joseph's had not wavered in its position on the treatment planning, and that cooperation between the two hospitals regarding this project had "broken down." It was pointed out that the nullification of the certificate of need would not impede patient access to oncology and radiation therapy services.

On July 31, 1992, Chilton responded to St. Joseph's letter to the Commissioner requesting nullification of the certificate of need.

This letter referred to the Agreement as the "proposed affiliation agreement," and stated that if that agreement was the compelling reason for the state's approval of the certificate of need, Chilton would try and make similar affiliation arrangements with another facility in the area. On August 14, 1992, Commissioner Dunston sent a letter to both parties extending the date of resolution of the matter to October 31, 1992. She encouraged them to "seek assistance from Deputy Commissioner Gerry Goodrich in either (1) resolving the controversy surrounding the Agreement on Principles; or (2) concluding that failure to resolve this matter may require termination of the Certificate of Need."

On September 21, 1992, the President of Chilton wrote to Deputy Commissioner Goodrich stating that St. Joseph's refusal to modify the Agreement on Principles was unreasonable. In this letter, he included a twenty-three page letter that set forth Chilton's position. In this twenty-three page letter, he explained that Chilton engaged a "Blue Ribbon Panel of recognized experts in the field of cancer care" to study the matter. The Panel determined "that simulation, treatment planning, dosimetry and brachytherapy must be performed on Chilton's campus in the interest of quality patient care." He continued: "Chilton believes that as a matter of public policy—the protection of quality of patient care—the Agreement on Principles should be modified, to reflect that simulation, treatment planning and dosimetry take place on Chilton's campus as authorized by the Certificate of Need Approval."

On October 22, 1992, Chilton's attorney wrote to the New Jersey Department of Health stating: "[s]ince St. Joseph's has been unwilling to consider any changes to the Agreement on principles, Chilton believes its *finalization* should be eliminated as a condition of the Commissioner's approval or alternatively, the Agreement should be modified." (Emphasis added). Chilton incorrectly referred to finalization when the Commissioner's condition was to "formalize and implement" the agreement.

In his October 22, 1992, letter, Chilton's attorney wrote that the "foundation principle" of the Agreement on Principles was to refer high voltage radiation therapy patients to St. Joseph's. St. Joseph's, however, asserts in its brief that:

To St. Joseph's, the provision of a physicist and dosimetrist, the use of the simulator only at St. Joseph's, and the afterloading of radioisotopes at St. Joseph's, were *equally important parts* of that Agreement and were *fundamental* to the withdrawal of St. Joseph's opposition to Chilton's application.

[Emphasis added.]

In its attorney's letter, Chilton cited *N.J.A.C.* 8:43G–28.18(a), which requires that "[e]ach radiation therapy department that has a linear accelerator shall have at least one simulator." In response, St. Joseph's asserts that under *N.J.A.C.* 8:43G–28.16(c), "[c]omputerized treatment planning for radiation therapy shall be available either on-site or by arrangement with another provider of services."

On November 17, 1992, Acting Commissioner of Health, Dr. Bruce Siegel, wrote to Chilton granting an extension until November 17, 1993, "to implement the certificate of need granted to you on May 16, 1991 for the establishment of radiation therapy services at Chilton Memorial Hospital." In his letter, Siegel acknowledged that Dunston's approval was conditioned on Chilton "formalizing and implementing" the Agreement, and quoted the portion of the original approval letter that read, "[f]ailure to satisfy this condition, as determined by the Commissioner of Health, may form a sufficient basis to nullify this approval."

However, he considered Chilton's petition to remove the condition or to modify the agreement and stated, "I will not exercise my discretion to nullify your approval: to the contrary, I am amending the initial approval by virtue of this letter." He asserted that the initial approval "is admittedly confusing," and then proceeded to amend the May 16, 1991, certificate of need approval to remove the condition that the parties "finalize the agreement on principles." This permitted the simulator, treatment planning, and dosimetry equipment to be located at the Chilton campus. The

condition that Chilton would refer patients requiring treatment on a high energy linear accelerator to St. Joseph's remained in effect. On February 9, 1993, Siegel, as Commissioner of Health Designate, wrote to Chilton approving changes in cost required by the increased scope of Chilton's certificate of need. Curiously, he noted, "[t]he conditions placed on the original certificate of need approval dated May 16, 1991 remain in effect."

St. Joseph's argues that it originally objected to the Chilton certificate of need and only withdrew its opposition after the parties negotiated the Agreement under which "Chilton would take approximately 25–30% of St. Joseph's patients but if Chilton had a low energy linear accelerator and St. Joseph's had the high energy equipment, and did the treatment planning at St. Joseph's, everyone would benefit." St. Joseph's argues that irreparable harm would befall St. Joseph's and the public if Chilton is permitted "to institute a program which would never have received approval, or a waiver, in the first place if St. Joseph's had not dropped its opposition to the certificate of need." St. Joseph's asserts that Chilton received approval "through confusion and mistake" and should be required to "go back to square one" and make a new application. St. Joseph's argues that the decision of the Commissioner of Health was arbitrary and capricious where he deleted the provision of the Agreement pertaining to simulation, dosimetry, and treatment planning, and that the adoption of the "Blue Ribbon Panel" report by the Acting Commissioner was outside of the record and an invalid basis for modifying the certificate of need.

Chilton maintains that the decision of the Commissioner of Health to delete the provisions of the Agreement on Principles pertaining to simulation, dosimetry, and treatment planning was reasonable and not arbitrary and capricious. Chilton asserts that the continuing growth of its cancer care program reflects a need for accessible cancer care services in its area. Chilton points out that it employed a "Blue Ribbon Panel" which concluded that off-site treatment planning is "unthinkable" and state regulations

(*N.J.A.C.* 8:43G–28.18(a)) and quality of care standards require on-site treatment planning, including simulation, and that Chilton has spent hundreds of thousands of dollars to implement the certificate of need.

We may not upset a determination of an agency absent a showing that it was arbitrary, capricious, or unreasonable; not supported by the evidence; or that it violated legislative policies expressed or implied in the act governing the agency. *Campbell v. Dep't of Civil Serv.,* 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963). Mindful of that standard, we must nonetheless reverse the decision of the Commissioner of Health which amended the certificate of need by deleting the provision that simulation, dosimetry, and treatment planning would be at St. Joseph's. This amendatory action should have been carried out in conformance with the process required for issuance of a certificate of need by reason of the substantial nature of the amendment.

When Commissioner Dunston approved the certificate of need on March 26, 1991, her approval letter granted the waiver from the requirements of then existing *N.J.A.C.* 8:33I–1.3(a) and (b) because Chilton "presented documentation of a working partnership with another provider of the service in HSA I which calls for the referral of all high energy patients to that provider. . . ." The Commissioner conditioned the approval on the following requirement:

> The applicant must formalize and implement the December 3, 1990 agreement entered into between the Chief Executive Officers of Chilton Memorial Hospital and St. Joseph's Hospital and Medical Center prior to initiating operations. Documentation of same must be provided to the Certificate of Need Program. Failure to satisfy this condition, as determined by the Commissioner of Health, may form a sufficient basis to nullify this approval.

Commissioner Dunston noted that a final decision could not then be made because the HSA had 30 days to request a hearing. On May 16, 1991, only after the HSA did not exercise its right to request a hearing on the conditional approval, the Commissioner formally approved the certificate of need.

We are satisfied that it was through inadvertence that the Commissioner included in the approval "a Varian Ximatron–CX simulator, and appropriate treatment planning and quality measurement (dosimetry) equipment." Approval for the simulator, treatment planning, and dosimetry equipment to be at Chilton was contrary to the Agreement. Chilton attempted to capitalize on this inclusion; however, the Commissioner, noting the variance, sought to have the parties reconcile the agreement. The parties were unable to amend their Agreement to accommodate these changes.

In his November 17, 1992, letter, Acting Commissioner Siegel acknowledged that the May 1991, approval was conditional. Unfortunately, he viewed this condition as merely being subject to his discretion. He stated, "I will not exercise my discretion to nullify your approval: to the contrary, I am amending the initial approval by virtue of this letter." He, therefore, proceeded to amend the May 16, 1991, certificate of need approval to remove the condition that the parties "*finalize* the agreement on principles." (Emphasis added). Thus, the simulator, treatment planning, and dosimetry equipment to be located at the Chilton campus were included in the certificate of need approval granted to Chilton.

Under *N.J.S.A.* 26:2H–7 of the Health Care Facilities Planning Act, "[n]o health care facility shall be constructed or expanded, and no new health care service shall be instituted after the effective date of P.L.1971, c. 136 (C.26:2H–1 et seq.) except upon application for and receipt of a certificate of need...." A certificate of need is granted when the action proposed in the application is necessary to provide required health care in the area to be served; can be economically accomplished and maintained; will not have an adverse economic or financial impact on the delivery of health care services in that area; and will contribute to the orderly development of adequate and effective health care services. *N.J.S.A.* 26:2H–8 and 9.

█ It is apparent that removing the condition relating to the Agreement caused such a significant change in scope as to require

a new certificate of need with full opportunity for interested parties and agencies to be heard. *N.J.A.C.* 8:33–2.11(a)3iii (then existing). Under *N.J.A.C.* 8:33–2.11(a)3iii, "[a]ny significant change in the scope of an approved project requires a Certificate of Need," and a significant change includes an addition of any of the standard categories of health care services. "Change in project scope" is defined in then existing *N.J.A.C.* 8:33–1.6, as "a deviation from the approved project which results in an increase or decrease in . . . (3) [a]rray of services." Under then existing *N.J.A.C.* 8:33–1.6, "health care service" includes "outpatient, inpatient, and post-discharge care provided in or by a health care facility, and such other items or services as are necessary for such care, which are provided by or under the supervision of a physician for the purpose of health maintenance or diagnosis or treatment of human disease . . . ." Simulation, treatment planning, and dosimetry are "health care services" and amending the certificate of need to permit these services to be offered at Chilton was a significant increase in the "array of services" allowed. Therefore, a new certificate of need was required.

Chilton argues that *N.J.A.C.* 8:43G–28.18(a), which requires that each radiation therapy department that has a linear accelerator shall have at least one simulator, supports the Acting Commissioner's actions in deleting the condition. This argument overlooks the fact that approval of Chilton's linear accelerator was not an absolute grant and that approval was premised on the formalization of the Agreement between Chilton and St. Joseph's.

■ When determining whether an administrative action has statutory authorization, an appellate court must look to the statutory policy sought to be achieved. *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 562, 384 *A.*2d 795 (1978). Acting Commissioner Siegel's decision to amend the certificate of need resulted in a circumventing of the full review process contemplated for the granting of a certificate of need. Here, both HSA and the objector were denied the ability to be heard anew on the fundamental question of whether existing providers would be

jeopardized if the working partnership evidenced by the Agreement was significantly altered. The statutory concern that the financial impact on the area health care services be fully explored was not honored. *N.J.S.A.* 26:2H–8.

We reverse Acting Commissioner Siegel's decision which, in effect, granted a new and expanded certificate of need by removing the requirement that the provisions of the Agreement that simulation, treatment planning, and dosimetry be performed at St. Joseph's. Although the original condition placed on the certificate of need approval only stated that failure to formalize and implement the Agreement *may* form a basis to nullify approval, nonetheless, the modification was so substantial as to require nullification so that the approval process could be conducted in accordance with the requisite statutory standards. Therefore, Acting Commissioner Siegel did not have the discretion to remove the condition and to grant approval of the certificate of need without complying with the process required for a new application.

Reversed and remanded.